HAMILTON F. KEAN and Others, Members of the Copartnership of KEAN, TAYLOR & Co., Respondents, v. MARYLAND CASUALTY COMPANY, Appellant.*

First Department, June 24, 1927.

Insurance — indemnity and theft insurance — brokers and bankers' blanket bond — action to recover loss — loss arose through criminal act of customer in giving check for purchase of securities without funds to meet it — policy covers loss through robbery; larceny (common-law or statutory), burglary, etc., while property is in specified places — provision as to statutory larceny not construed to include present loss — present loss falls within exemption from liability where loss caused by act of partner and also within exemption from liability for loss in trading — evidence shows that plaintiffs did not rely on false statement of customer.

This is an action on a bankers and brokers' blanket bond to recover a loss suffered by the plaintiffs. The loss occurred through the fact that a customer of the plaintiffs criminally issued a check to the plaintiffs in payment for certain securities which the customer represented were being purchased for a bank. There were not funds sufficient to meet the check when it was presented for payment. One of the partners of the plaintiffs authorized the delivery of the securities upon the uncertified check and before the check had been collected.

The loss does not fall within the provisions of the policy which insures the plaintiffs against loss from robbery, larceny (common law or statutory), burglary, theft, etc., while the property is located in specified places, for a proper construction of the policy leads to the conclusion that it covers losses occasioned by employees through theft of securities by persons present at the place where the securities are located.

The phrase "statutory larceny," which ordinarily would include the loss in question, cannot be construed to extend the policy to the loss suffered in this case.

The loss suffered by the plaintiffs is exempted by the express terms of the policy which provides that it does not cover a loss resulting directly or indirectly from any act of any partner of the insured. It appears that the acceptance of the order by the customer on an uncertified check prior to the time the check was presented for collection was authorized by one of the partners.

The transaction between the plaintiffs and their customer falls within the exception of the policy of any loss resulting directly or indirectly from trading. The term "trading" includes not only direct transactions between the insured and their customers but also transactions in which the plaintiffs acted as brokers as they did in this case.

Furthermore, it is shown by the evidence that the plaintiffs did not rely upon the false statement that the securities were being purchased for a Philadelphia bank but they had full knowledge before the securities were delivered that the purchaser was their customer and not the bank, and it further appears that at the time of the transaction the plaintiffs had no doubt of the financial responsibility of their customer so that a material element of the crime of larceny by false pretenses was lacking.

O'MALLEY, J., dissents.

---

* Revg. 127 Misc. 893.

APPEAL by the defendant, Maryland Casualty Company, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of New York on the 11th day of August, 1926, upon the verdict of a jury rendered by direction of the court pursuant to a stipulation that the case be tried before the court without a jury and that the verdict be directed with the same force and effect as if a jury were present, and also from an order denying defendant's motion for a new trial made upon the minutes.

*Henry deForest Baldwin* of counsel [*Thaddeus G. Cowell, James S. Hemingway* and *John H. Vincent* with him on the brief; *Edward J. Dowling,* attorney], for the appellant.

*Frank C. Laughlin* of counsel [*Joseph W. Kirkpatrick* with him on the brief; *Robert M. McCormick,* attorney], for the respondents.

FINCH, J.  The question presented by this appeal is the extent of the insurer's liability under an indemnity bond.  The facts are practically not in dispute and the determination involves a construction of the contract between the parties in the light of these facts.

The plaintiffs are bankers and brokers engaged in business in New York city.  Borden & Knoblauch were stockbrokers, with offices in Philadelphia.  In February, 1922, the plaintiffs commenced doing business with Borden & Knoblauch, buying and selling securities upon their orders.  The plaintiffs' offices and those of Borden & Knoblauch were connected by a direct private wire and there was a running account between these firms.  In July, 1922, Borden & Knoblauch commenced to purchase United States Treasury certificates through and from the plaintiffs in increasing quantities.  The practice was for the plaintiffs to deliver these certificates, usually by mail, upon receiving from Borden & Knoblauch uncertified checks for the amount involved.  The checks when received were credited to this running account of Borden & Knoblauch and deposited in plaintiffs' bank for collection.  As they were drawn on Philadelphia banks, a delay of two days was involved in their collection.  The plaintiffs, on the other hand, had to pay immediately for the securities purchased to fill the orders of Borden & Knoblauch, which deprived plaintiffs of the use of the money until such time as Borden & Knoblauch's checks were collected.  For this reason the plaintiffs, on November 13, 1922, notified Borden & Knoblauch that thereafter plaintiffs would require payments to be made in New York funds.  On November 17, 1922, Borden & Knoblauch requested the plaintiffs to purchase an aggregate of $450,000 United States Treasury certificates.  One

of the plaintiffs' firm thereupon notified Borden & Knoblauch that in accordance with the notification of November thirteenth, no further business could be transacted until payments in New York funds had been arranged. Borden & Knoblauch then represented that the certificates were being purchased for a banking corporation known as the Pennsylvania Company and asked that this transaction be allowed to go through upon the old basis of payment. This request was submitted by partner Duffy to the senior partner of plaintiffs' firm and permission given by the latter. The plaintiffs accordingly bought $450,000 of United States Treasury certificates. On Saturday morning, November eighteenth, the plaintiffs received from Borden & Knoblauch a check dated November eighteenth for the flat amount of $450,000 drawn upon the Pennsylvania Company, accompanied by a letter dated November seventeenth requesting that the check be deposited to the credit of the account of Borden & Knoblauch. The cost of the bonds was upwards of $4,000 more than the flat amount of this check. The account of Borden & Knoblauch was credited with the amount of the check and the check deposited in the plaintiffs' bank for collection. In accordance with the request of Borden & Knoblauch, the certificates were delivered on the morning of November eighteenth to the Federal Reserve Bank, at 15 Nassau street, New York city, for the account of the Pennsylvania Company. The Federal Reserve Bank wired the Treasury Department in Washington, requesting that the Federal Reserve Bank in Philadelphia be authorized to deliver $450,000 United States Treasury certificates of indebtedness, and wired the Federal Reserve Bank in Philadelphia to deliver the certificates to the Pennsylvania Company upon receiving authority from Washington. Such authority was given, and the Federal Reserve Bank in Philadelphia immediately advised the Pennsylvania Company of this fact. The representation by Borden & Knoblauch that the certificates were being purchased for the Pennsylvania Company was false. The Pennsylvania Company had been making loans to Borden & Knoblauch on Treasury certificates. Upon learning that the Federal Reserve Bank of Philadelphia held for the Pennsylvania Company $450,000 of certificates, the Pennsylvania Company upon request of Borden & Knoblauch loaned them a like amount and credited their account therewith. On Monday, November twentieth, $450,000 of Treasury certificates were delivered by the Federal Reserve Bank of Philadelphia to the Pennsylvania Company. Borden & Knoblauch had, however, already sold this amount of certificates to the Philadelphia National Bank and the certificates were delivered to this bank by the Pennsylvania Company

and a check received for $453,768.12, which was credited to the account of Borden & Knoblauch and applied against the loan of $450,000. When the check for $450,000 given by Borden & Knoblauch to the plaintiffs was presented to the Pennsylvania Company, there were insufficient funds and it was dishonored. On December 29, 1922, Borden & Knoblauch were adjudicated bankrupts. They were indicted on a number of counts and Knoblauch pleaded *nolle contendere* and was found guilty under an indictment for making and delivering a check on a depository in which the maker did not have a credit or funds with which to pay the same, and also under an indictment for false pretenses. The plaintiffs thus failed to receive payment for the certificates delivered to the Federal Reserve Bank in New York and claimed to be entitled to indemnification by the defendant under the bond issued by the latter. Whether said bond covers a loss sustained under the foregoing circumstances presents, therefore, the question upon this appeal

The bond is designated as a " Bankers' and Brokers' Blanket Bond, Standard Form No. 11." It recites that the premium is based upon the total number of insured's officers and employees. By said bond the defendant undertakes to indemnify the insured against loss " to an extent not exceeding $250,000 of money, currency, bullion, bonds, debentures, scrip, certificates, warrants, transfers, coupons, bills of exchange, promissory notes, checks or other similar securities hereinafter referred to as property in which the insured has a pecuniary interest or for which it is legally liable, sustained by the insured subsequent to noon of the date hereof    *    *    *

" (a) Through any dishonest act of any of the employees, wherever committed, and whether committed directly or by collusion with others;

" (b) Through robbery, larceny (whether common-law or statutory), burglary, theft, hold-up, misplacement or destruction, whether effected with or without violence, or with or without negligence on the part of any of the employees, while the property is actually within any of the insured's offices covered hereunder, or actually within any recognized place of safe deposit within the United States, or is actually within the premises of any of the insured's correspondent banks within the United States, or is actually within the premises of any transfer or registration agent within the United States for the purpose of exchange, conversion, registration or transfer in the usual course of business;

" (c) Through robbery, larceny (whether common-law or statutory), hold-up, or theft, by any person whomsoever, while the

property is in transit within twenty miles of any of the offices covered hereunder and in the custody of any of the insured's partners or any of the employees, or through negligence on the part of any of the employees having custody of the property while in transit as aforesaid.  *  *  *

" The foregoing agreement is subject to the following conditions and limitations:

" 1. The offices of the insured which are covered hereunder are located as follows:

" Main Office: (Give exact local address) # 5 Nassau Street, New York City.

" Branch Offices: (Give exact local address of each covered hereunder)   None."

Then follows a provision that if the insured desires any other offices to be covered, it shall give the location thereof and the number of officers and other employees therein and shall pay an additional premium.

Paragraph 2 includes the following:

" This bond does not cover:  *  *  *

" (c) Any loss resulting directly or indirectly from any act or acts of any director of the insured, other than one employed as a salary official, or of any partner of the insured.

" (d) Any loss the result of any loan made by the insured or by any of the employees, whether authorized or unauthorized, unless such loan be made with intent on the part of such employees to defraud the insured.  *  *  *

" (f) Any loss resulting directly or indirectly from trading, actual or fictitious whether in the name of the insured or otherwise, and whether or not within the knowledge of the insured, and notwithstanding any act or omission on the part of any employee in connection therewith, or with any account recording the same.

" (g) Any loss resulting from any cause whatsoever, of United States Government Coupon Bonds, United States Certificates of Indebtedness and Money after such property is entrusted to any messenger or messengers of the Insured, unless it shall be in transit under the following conditions:

" 1. Where the par value of such property is the sum of $15,000 or less, it shall be in the custody of a partner or employee of the insured.

" 2. Where the par value of such property is greater than the sum of $15,000 and not more than the sum of $250,000, it shall be in the custody of a partner or employee of the insured, who shall be continuously accompanied by a guard of twenty-four years of age or more; provided, however, that if the partner or employee

is twenty-four years of age or more, the guard may be under the age of twenty-four but not under twenty-one.

" 3. Where the par value of such property is in excess of the sum of $250,000 it shall be in the custody of a partner or employee of the insured, who shall be continuously accompanied by two guards of twenty-four years of age or more; provided, however, that if the partner or employee is twenty-four years of age or more, the guards may be under the age of twenty-four but not under twenty-one.

" 4. That this bond shall not cover any loss when an outside messenger service is employed in carrying or guarding any property."

The bond was prepared by the defendant company and such terms as are ambiguous must be resolved against the company if the construction in favor of the insured may fairly be adopted without giving the language a forced and unnatural meaning. (*Silverstein* v. *Commercial Casualty Ins. Co.*, 237 N. Y. 391, 393.) What character of loss, therefore, does this bond fairly cover, and can the loss suffered by the plaintiffs fairly be said to be within what the parties contemplated, in so far as the language shows such intention? We are of the opinion that the loss suffered by the plaintiffs did not arise out of a risk within the coverage of the bond, for the following reasons: Section (a) of the bond is a fidelity provision relating to the dishonest acts of employees. Section (b) of the bond relates to the loss of property through robbery, larceny, burglary, theft, hold-up, misplacement or destruction while the property is in certain designated places, namely, within any of the insured's offices or within any recognized place of safe deposit, or within the premises of any of the insured's correspondent banks, or within the premises of any transfer or registration agent for the purpose of exchange, conversion, registration or transfer in the usual course of business. Section (c) relates to loss through robbery, larceny, hold-up or theft while the property is in transit within twenty miles of any of the offices covered. It is thus seen that the bond covers losses by employees, losses while the property is actually within certain specified places and losses occurring within twenty miles of any of the offices. A reading of the bond shows that the loss must occur through robbery, larceny, burglary, theft, hold-up, misplacement or destruction not only while the property is in the specified localities but also by the crime of a person there present. The only words which throw any doubt upon the fact that the crimes mentioned must be committed not only while the property is in these specified localities but also by the crime of a person there present, are the words in parenthetical reference to statutory larceny, namely, larceny, " whether common-law or

statutory." If it were not for this parenthetical reference to statutory larceny, there is no question that this claim could not be made. Not a word in the remainder of the bond suggests the possibility that the present loss might thereby be covered, except this reference to statutory larceny. The sense in which the phrase "statutory larceny" is used presents an ambiguity and standing in this context must fall within the recognized principle of *noscitur a sociis.* Whether the words "statutory larceny" mean such larceny where the property is located, or mean statutory larceny arising anywhere, presents an ambiguity which must be resolved by the setting or context of the phrase. The other words of the context, namely, "robbery, larceny, burglary, theft, hold-up," all import a crime which involves a taking of the property at the place where located. So also misplacement and destruction must occur at the same place. Hence statutory larceny appearing in this context must be likewise limited to fraudulent schemes perpetrated upon those in possession of the securities by persons present at the place where the securities are. As was said by the late Mr. Justice FIELD for the court in *Virginia* v. *Tennessee* (148 U. S. 503, 519): " It is a familiar rule in the construction of terms to apply to them the meaning naturally attaching to them from their context. *Noscitur a sociis* is a rule of construction applicable to all written instruments. Where any particular word is obscure or of doubtful meaning, taken by itself, its obscurity or doubt may be removed by reference to associated words. And the meaning of a term may be enlarged or restrained by reference to the object of the whole clause in which it is used."

Practical reasons for applying this rule of construction to the facts in the case at bar are apparent when it is considered that if this bond be held to cover the plaintiffs' loss through the aforesaid transaction, it would in effect be equivalent to a blanket certification or guaranty of all checks up to $250,000 received by plaintiffs in payment for securities delivered if there should not have been sufficient funds to meet such checks when the same were delivered. Thus by this phrase the bond, which upon its face purports to be in general a fidelity bond for employees, plus a theft policy, under certain restricted conditions, would have added to it a third provision against loss arising out of the fraud of plaintiffs' customers occurring at a place other than where the property was located. If the bond had been intended to cover such a risk, then the limitation of the loss to certain specified places would have been quite immaterial. There would have been no reason for making the test of liability the place in which the property happened to be when the loss was effected. In attempting to make the bond

cover a loss perpetrated by a customer over the telephone one hundred miles away, it is interesting to note that Borden & Knoblauch did not obtain from the plaintiffs the certificates which the latter possessed at all, but only similar certificates which the Federal Reserve Bank in Philadelphia was authorized by the Treasury Department to deliver to the Pennsylvania Company.

The bond, therefore, by its context, leaves no room for doubt that the parties intended thereby to cover loss by statutory larceny, as well as loss by the means otherwise specified, committed not only while the property is in the specified localities but also in person where the property is located.

It also appears that the loss in question falls within an express exception of the bond. The bond provides that it shall not cover any loss resulting directly or indirectly from any act or acts of any partner of the insured. When Borden & Knoblauch requested plaintiffs to purchase for them the government certificates upon the usual terms of payment, namely, by uncertified check on a Philadelphia bank, the matter was taken under consultation by the partners in the plaintiffs' firm and the request granted. In other words, the risk was one voluntarily assumed by a partner of the firm. In addition, the risk assumed was in reality the taking of an uncertified check on a Philadelphia bank. It was thus a risk specifically excluded by the terms of the bond.

It would also seem that the transaction between the plaintiffs and Borden & Knoblauch falls within the exception of the bond of any loss resulting directly or indirectly from trading. This exception in the bond provides: " (f) Any loss resulting directly or indirectly from trading, actual or fictitious whether in the name of the insured or otherwise, and whether or not within the knowledge of the insured, and notwithstanding any act or omission on the part of any employee in connection therewith, or with any account recording the same."

The plaintiffs insist that the word " trading " should be held to include only a transaction where the parties acted as sellers and not as brokers. This contention, however, overlooks the entire wording of the exception, which is much broader than the word " trading " standing alone. The transaction in question was, as noted, a part of the running account between the plaintiffs and Borden & Knoblauch, and the payment was a flat sum to be credited on this account and less than the value of the securities. The loss, therefore, whether regarded as arising directly or indirectly, clearly grew out of a trading account.

Moreover, the facts show that plaintiffs did not rely upon the statement that the property was being purchased for the Penn-

sylvania Company, since there was no understanding that the latter company was to pay for the securities. On the contrary, delivery was made by the plaintiffs upon the check of Borden & Knoblauch and not that of the Pennsylvania Company, showing that the plaintiffs had full knowledge before the securities were delivered that the purchasers were Borden & Knoblauch and not the Pennsylvania Company. The plaintiffs further conceded upon the trial that they had no doubts of the financial responsibility of Borden & Knoblauch and that the only reason for their unwillingness to accept checks on Philadelphia banks was because it resulted in tying up their funds for two days until collection could be made. It thus appears that a material element of the crime of larceny by false pretenses was lacking, namely, a false representation of a material fact, in reliance upon which the plaintiffs gave up possession of the property. As was said by Judge O'BRIEN in *People* v. *Miller* (169 N. Y. 339): " False pretenses as understood in the criminal law, as a means of obtaining the title or possession of money or personal property, imports an intentional false statement concerning a material matter of fact upon which the complainant relied in parting with the property or in delivering the possession."

In the light of the foregoing considerations it would be a forced and unreasonable construction of the contract between the parties to hold that it comprised a risk of loss arising out of such a transaction as in the case at bar. The courts, if possible, should avoid a construction producing such a result. As was said by Judge POUND in *Bushey & Sons* v. *American Ins. Co.* (237 N. Y. 24, 28): " The policy should be read, if it can be, without twisting words and rendering plain meanings nugatory, so as to make the scheme of the policy reasonable. * * * ' A construction which makes the contract fair and reasonable will be preferred to one which leads to harsh or unreasonable results.' "

We, therefore, hold that the defendant is not liable upon the bond for the loss suffered by the plaintiffs and that the judgment should be reversed, with costs to the appellant, and the complaint dismissed, with costs.

DOWLING, P. J., MARTIN and PROSKAUER, JJ., concur; O'MALLEY, J., dissents and votes for affirmance upon the ground that the evidence was sufficient to warrant a finding of statutory larceny within the coverage of the policy.

Judgment reversed, with costs, and the complaint dismissed, with costs.