**Leo SADE et al., Plaintiffs,**

v.

**NATIONAL SURETY CORPORATION, A Corporation, Defendant.**

**Civ. A. No. 616–60.**

United States District Court
District of Columbia.

April 17, 1962.

Lloyd J. Derrickson, Frank J. Wilson, Washington, D. C., for plaintiffs.

Harry L. Ryan, Jr., Whiteford, Hart, Carmody & Wilson, Washington, D. C., for defendant.

YOUNGDAHL, District Judge.

Plaintiffs, a resident partnership engaged in the stock brokerage business under the name Sade & Co., commenced this action against defendant National Surety Corporation, a registered foreign corporation doing business in the District of Columbia, to recover from defendant the sum of $18,476.69, claimed due under a surety bond underwritten by defendant to secure plaintiffs against certain losses.

On April 1, 1959, National issued to to Sade & Co. a standard "Brokers Blanket Bond," effective at the time of the transaction involved in this suit, providing protection to Sade & Co. up to the maximum amount of $30,000. The annual premium for this bond was between four and five hundred dollars. It is plaintiffs' contention that they are entitled to recover from defendant their sustained losses under either of two indemnifying clauses contained in the bond. Defendant, on the other hand, contends that plaintiffs are not entitled to recover under either of said clauses, since the transaction resulting in the loss is one specifically excluded from coverage under its bond.

The relevant provisions of the bond are as follows:

"LOSSES COVERED
"Fidelity

"(A) Any loss through any dishonest, fraudulent or criminal act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss of Property [1] through any such act of any of the Employees.

"On Premises

"(b) Any loss of Property through robbery, burglary, common-law or statutory larceny, theft, hold-up, or other fraudulent means, misplacement, mysterious unexplainable disappearance, damage or destruction, abstraction or removal from the possession, custody or control of the Insured (whether effected with or without violence or with or without negligence on the part of any Employee) * * * while the Property is (or is supposed to be) lodged or deposited within any offices or premises located anywhere, except while in the mail or in any of the Insured's offices specifically excluded from the coverage of this bond * * *

"This Bond Does Not Cover

"(g) Any loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, in the name of the Insured or otherwise, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, except when covered under Insuring Clause (A), (D) or (E)."

The present claim arose out of the following sequence of events: Sometime early in August, 1959, S. Thomas Gueren, a registered securities repre-

1. "Wherever used in this bond Property shall be deemed to mean money, currency, coin, bank notes, Federal Reserve notes, postage and revenue stamps, U. S. Savings Stamps, bullion, precious metals of all kinds and in any form and articles made therefrom, jewelry, watches, necklaces, bracelets, gems, precious and semi-precious stones, bonds, securities, evidences of debts, debentures, scrip, certificates, interim receipts, warrants, rights, puts, calls, straddles, spreads, transfers, coupons, drafts, bills of exchange, acceptances, notes, checks, money orders, warehouse receipts, bills of lading, withdrawal orders, conditional sales contracts, abstracts of title, insurance policies, deeds, mortgages upon real estate and/or upon chattels and upon interests therein, and assignments of such policies, mortgages and instruments, and other valuable papers and documents, and all other instruments similar to or in the nature of the foregoing, in which the Insured has an interest or which are held by the Insured for any purpose or in any capacity and whether so held gratuitously or not and whether or not the Insured is liable therefor."

sentative and employee of Sade & Co., engaged in discussions with Stanley Sekular, a friend of long standing, relative to the purchase by Sekular through Gueren and Sade & Co. of certain securities. Sekular ultimately determined to purchase a substantial amount of stock in Television Shares Management Company, a large mutual fund management organization controlling assets in the neighborhood of four hundred million dollars. This was a new issue and would be traded on the over-the-counter market. On the day that Television Shares Management Company's stock was first traded, August 10, 1959, Gueren received an open order from Sekular for the purchase of up to $100,000 of said stock. At that time Gueren informed Sekular that he could not accept such an order unless he had a check in his hands. Sekular thereupon came to the Sade & Co. office and gave Gueren a check, blank except for Sekular's signature as maker and the word "August" with no specified date thereafter. Sekular instructed Gueren that the check was to be completed and delivered only upon receipt by Sekular of confirmation by Sade & Co. to Sekular of the consummation of the transaction.

On several occasions prior to August 10th Gueren had spoken to Sekular with regard to the latter's financial ability to effect a substantial securities purchase. Some ten days before the date of issue, Sekular informed Gueren that $100,000 was to be deposited in Sekular's checking account for this purpose. Gueren was further informed that the money was being supplied by certain executives in Philadelphia. On August 9th, Gueren again asked Sekular how he intended to pay for the stock; Sekular replied, "The money is as good as in the bank." On the day of the purchase, Sekular told Gueren, "The money is in the bank. Go ahead and buy it." Leo Sade, a partner in the plaintiff firm, admitted at the trial that he was aware of the receipt of this order prior to its execution.

On August 10th, Sade & Co. placed two orders for Television Shares Management stock for the Sekular account through the New York brokerage house, Gregory & Sons. 1,300 shares were purchased at 26½ and 1,000 shares at 26¼. The total cost of this stock to Mr. Sekular, including commissions, was $61,440.55. Confirmation of the purchase was mailed to Sekular on that date. Due to illness, Gueren was unable to come to his office on the settlement date, August 14th, or the next two business days, August 17th and 18th. After having received a phone call from Miss Mahon, the office manager of Sade & Co., on August 19th, the seventh business day after purchase, Gueren did come to the Sade & Co. office to turn in the Sekular check. The check was then completed as to amount and date and deposited for collection. On August 21st, Miss Mahon received a call from Sekular's bank informing her that there were not enough funds to clear the check. Gueren was not aware of this until Monday, the 24th, for the reason that he had spent the week end with his family out of town. Upon receiving this information, Gueren contacted Sekular who stated that there was some sort of "mix-up" and that the check should be redeposited. This was never done, as Sade & Co. then called Sekular's bank and learned that Sekular had only a $200 balance in his account. On August 25th, Sekular's "NSF" check was returned to Sade & Co.

A series of phone calls, conversations, meetings and accusations then ensued between Sade & Co., Sekular, Gueren, and members of the families of the two individuals. On August 26th, Sade & Co. received $1,900 in cash from Sekular. On that same date a telegram was sent to Sekular reserving the right to sell out his account in full after 3:00 P.M., August 28th, "or as soon thereafter as practicable predicated upon prevailing market conditions." No further payments were forthcoming and sale of the stock was eventually effected in three separate transactions on September 1st

and 3rd, and December 24, 1959. Due to a rapidly falling market in this stock, not only was it difficult to locate purchasers, but is was also necessary to incur substantial losses when the sales were finally effected.[2] The total loss to plaintiffs was $18,476.69.

On September 11, 1959, a notice of loss was sent to and claim made upon the defendant because of Sekular's fraudulent action in uttering a bad check. Subsequent to that date Leo Sade received certain information leading him to believe that Gueren had acted in collusion with Sekular in an attempt to make a "windfall" profit on the Television Shares transaction. On September 25th, Gueren was discharged by Leo Sade and on October 14th, a further claim was submitted to defendant alleging Gueren's complicity with Sekular. Both claims were rejected by defendant. Several efforts were also made by Sade through the United States Attorney's Office to prosecute both Sekular and Gueren but no prosecution was ever commenced.

■ Plaintiffs' initial contention goes to the question of coverage under indemnifying clause (A) of the "Brokers Blanket Bond." Clause (A) provides the insured with coverage up to the maximum amount of the bond for any loss occasioned by the "dishonest, fraudulent or criminal act of any of the employees * * * whether committed alone or in collusion with others." Plaintiffs assert that in August, 1959, their employee Gueren entered into a scheme with Sekular for the purchase of up to $100,000 worth of Television Shares Management stock when issued; that neither could pay for that amount of stock, but they hoped that after purchase, the price of the stock would rise so that it could immediately be resold at a profit; that the plan was for Gueren to hold the check given him in payment for the stock by Sekular for a sufficiently long period of time so that resale could be effected and the proceeds of the sale deposited to cover the check.

If plaintiffs' theory were substantiated by the proof offered at trial, there is no doubt that they would be entitled to indemnification under the provisions of clause (A) of the bond. Therefore, it is necessary to examine the evidence as to any "dishonest, fraudulent or criminal acts" by Sekular and/or Gueren. Sekular did not testify at the trial of this cause of action. However, the evidence offered by others who did testify clearly established Sekular's fraud and bad faith with regard to this transaction. Sekular caused Gueren to believe that he was possessed of a substantial amount of money and that a check Sekular presented to Gueren would be cleared up to the sum of $100,000, when presented for payment. On the day that the purchase in question was effected, Sekular unequivocally stated to Gueren that the money was in the bank and the stock should be purchased. In truth, Sekular had no more than $200 in his account; the disparity between that figure and the one he stated to Gueren cannot be explained away as a mistake. There is no doubt that Sekular was engaging in a fraudulent and dishonest scheme in an attempt to reap a windfall profit. However, although the fraud of Gueren alone or Gueren in consort with Sekular would give rise to a claim against defendant under clause (A), the fraud of Sekular alone is not enough to substantiate such a claim.

What of Gueren's conduct? Plaintiffs' contentions proceed to outline a rather detailed scheme of fraud perpetrated upon Sade & Co. by Gueren in collusion with Sekular. These contentions have already been summarily stated. There is no need for the Court to deal with them in any greater detail for plaintiffs

---

2. A further credit of $4,323.03 was received by the transfer of securities from the accounts of Gueren and his parents to that of Sekular. This amount is not reflected in plaintiffs' computation of damages since it is the subject of a suit presently pending in this court. Gueren v. Sade, No. 365-60. Plaintiffs concede that should they prevail in that suit, there should be an offset against the above $18,476.69 plus interest in an amount consistent with that judgment.

have not proven by a fair preponderance of the evidence that Gueren was a party to any fraudulent or dishonest scheme. Instead, the implication is clear that Gueren, himself, was duped and defrauded by his former friend's protestations of newly acquired wealth. It may be that Gueren acted carelessly in accepting such a large order without first checking on Sekular's financial worth, but his carelessness was certainly no greater than that of Leo Sade, a man of infinitely greater experience in the stock brokerage business, who admitted that he knew of this order prior to its execution, yet took no precautions to check on Sekular's financial ability.[3] The Court cannot engage in speculation when dealing with an accusation of fraud and dishonesty; it must be substantiated by evidence, and plaintiff has not sustained its burden of proof on this issue. And, of course, relevant to the charge against Gueren is the fact that an unsuccessful attempt was made to initiate prosecution against him by the United States Attorney's office.

■ But plaintiffs further insist that they may still recover under clause (A) because Gueren, being plaintiffs' agent, owed a fiduciary duty of trust, good faith and loyalty to plaintiffs, and that by passively permitting what it was his duty to prevent, he committed a dishonest act within the meaning of the fidelity clause of the bond. The Court does not believe that plaintiffs' contention represents the law. "For an act to be 'dishonest' within the meaning of a fidelity suretyship bond, there must exist the element of moral turpitude or want of integrity." Commercial Banking Corp. v. Indemnity Ins. Co., 1 F.R.D. 380, 382 (E.D.Pa.1940). As another court stated this proposition, in order to show personal dishonesty within the meaning

of a fidelity clause, there must be both "a want of integrity and an intentional breach of trust." United States Fidelity & Guaranty Co. v. Bank of Thorsby, 46 F.2d 950, 951 (5th Cir. 1931). In other words, there must exist a compelling sense of conscious wrong rather than a mere omission or act amounting to negligence. The latter, to the contrary, is the most that plaintiffs have been able to prove with regard to Gueren's conduct.

■ As an alternative proposition, plaintiffs assert that even though their claim may be barred under clause (A), that they are still entitled to recover under clause (B) on the basis of Sekular's fraudulent conduct alone. Clause (B) is entitled "On Premises" losses, and this, most certainly, is plaintiffs' greatest hurdle, for from even a most cursory reading of that paragraph it is apparent that the instantly sustained loss is not indemnificatory under the provisions of that section. The segment of clause (B) that plaintiff does rely upon reads as follows: "Any loss of Property through * * * other fraudulent means * * * while the Property is (or is supposed to be) lodged or deposited within any offices or premises located anywhere." What is intended by the expression "on premise loss" is apparent from the acts specifically included in clause (B). These are robbery, burglary, larceny, theft, holdup, misplacement, unexplained disappearance, damage or destruction, abstraction or removal from the custody or control of the insured, and loss of subscription, conversion, redemption or deposit privileges through the misplacement or loss of property, while on the insured's premises. Section (B) of the bond, as this Court interprets it, is an agreement to indemnify plaintiffs for the theft or its equivalent, of certain "property" as defined in the bond, and is not to be broadened by .

---

3. The order was for an amount up to $100,000; Gueren had only acted as a registered representative for a relatively short period of time; Sekular had never traded with Sade & Co. before. Despite confrontation with these uncontroverted facts, Leo Sade insisted to the Court that such a transaction is not unusual and that under these circumstances it is not the custom of Sade & Co. to take the precaution of a phone call to the prospective customer's bank. Such a method of doing business strikes the Court as inconceivable.

the clause "or other fraudulent means," so as to include every loss resulting from fraud.

In support of its assertion that they are entitled to indemnification under clause (B), plaintiffs rely upon Fidelity and Casualty Co. of N. Y. v. Bank of Altenburg, 216 F.2d 294 (8th Cir. 1954) and National Bank of Paulding v. Fidelity and Casualty Co., 131 F.Supp. 121 (S.D.Ohio 1954). It is significant to note that in each of these cases where recovery was allowed for the loss of "Property" abstracted by false pretenses from the premises of the insured, the insured was a bank and not a stock broker; that the transaction grew out of a "check kiting" scheme whereby upon deposit of a check with the bank, credit was granted and checks thereupon drawn on the insured bank to its detriment; hence, as each court noted, money was withdrawn from the bank, thereby resulting in a loss of property from "on premises." Sekular, of course, never withdrew any property from the premises of Sade & Co.

Plaintiffs contend that the language of section (B) when read with the definition of "Property" contained in the bond is somewhat confusing and doubtful. Therefore, under the rule of law that where there exists doubt as to the construction of a bond or other insurance policy, that doubt is to be resolved in favor of the insured, plaintiffs assert that they must still prevail. The Court is well aware of the fact that the term "Blanket Bond" indicates that coverage is to be wide and that it is not unfair to interpret the document in this fashion. Fidelity Trust Co. v. American Surety Co. of N. Y., 268 F.2d 805 (3d Cir. 1959). At the same time, this canon of law "furnishes no warrant for avoiding hard consequences by importing into a contract an ambiguity which otherwise would not exist, or, under the guise of construction, * * * forcing from plain words unusual and unnatural meanings." Bergholm v. Peoria Life Ins. Co., 284 U.S. 489, 492, 52 S.Ct. 230, 76 L.Ed. 416 (1932). This Court is of the opinion that the construction it applies to clause (B) of the bond is the only possible one without reading into the policy language which is not there.

Even assuming *arguendo* that the claimed loss were ostensibly included under clause (B) of the bond, plaintiffs would still not be entitled to indemnification, for the loss they sustained is one specifically excluded from coverage under the policy. Section 1(g) of the National bond excludes from coverage "any loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, in the name of the Insured or otherwise, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, except when covered under Insuring Clause (A), (D) or (E)." In construing this section of the bond—the "trading loss" provision—plaintiffs assert that the term "trading" has a special connotation in the securities business; that trading means purchase and sale for a gain by a dealer, for its own profit and in its own name; that this type transaction must be distinguished from the transaction in the instant case, where a purchase was made for a customer's account, called an investment account, for a commission, and that it is the former rather than the latter concept that was intended in this bond provision. The defendant, on the other hand, contends that the term "trading" as used in the National bond includes the ordinary operation of buying and selling stocks for customers. It is defendant's position that a trading loss provision in a broker's bond is a usual and necessary provision, for otherwise the door would be wide open for any stock brokerage firm to engage in, and to permit limitless transactions upon scanty or no credit investigation with absolute assurance that if the customer were unworthy, the bonding company would nevertheless be a guarantor of the transaction.

The Court recognizes the existence of a technical distinction between a trader and a broker. However, it interprets the word "trading" as used in the National policy indemnifying plaintiffs against certain losses with the exception of those

"resulting directly or indirectly from trading" as not having the restricted meaning for which plaintiffs contend, but the same meaning it has in any mercantile business, namely, the buying and selling of commodities—in the instant case, the buying and selling of securities on a customer's account. cf., Harris v. National Surety Co., 258 Mass. 353, 155 N.E. 10, 11 (1927).

In the final analysis it is clear that what has occurred in this case is the following: plaintiffs' employee, Gueren, with the knowledge of plaintiffs, accepted a customer's order to purchase a substantial amount of stock for which the customer lodged with plaintiffs' employee a check which, when thereafter deposited, was dishonored. The only element that distinguishes this purchase transaction from all the thousands of others that plaintiffs execute each year is the fact that the customer, Sekular, issued a "NSF" check in payment for said stock. Therefore, if plaintiffs' contention as to the scope of coverage under clause (B) as well as the meaning of the term "trading loss" were followed, the Court would be in the position of saying to defendant that for a premium of between four and five hundred dollars per year you are hereby deemed to be an unqualified indorser on each and every check [4] issued to plaintiffs, up to the amount of $30,000. As plaintiffs' own witness testified, no insurance company could remain in business very long if it underwrote that type of coverage for a premium of four to five hundred dollars per year.

Defendant cites a series of cases for the proposition that the Court should interpret the term "trading loss" broadly, rather than in any particularized manner. These cases are not on point for the reason that they deal with employee dishonesty and a somewhat dissimilar

bond provision. However, to a certain degree they corroborate the Court's conclusion that the term "trading loss" was not herein employed in a technical sense. See, generally, Earl v. Fidelity & Deposit Co., 138 Cal.App. 435, 32 P.2d 409 (1934); Rath v. Indemnity Ins. Co., 2 Cal.App.2d 637, 38 P.2d 435 (1934); Kean v. Maryland Casualty Co., 221 App. Div. 184, 223 N.Y.S. 373 (1927); Harris v. National Surety Co., 258 Mass. 353, 155 N.E. 10 (1927).

The Court finds that plaintiffs are not entitled to recover from defendant under said bond.

Let this memorandum be considered Findings of Fact and Conclusions of Law.

---

4. 22 D.C.Code § 1410 (1961): "As against the maker * * * thereof the making * * * of a check * * * which is refused by the drawee because of insufficient funds * * * shall be prima facie evidence of the intent to defraud and of knowledge of insufficient funds in or credit with such bank" unless the check is made good within five days of receiving notice, *ergo*, National would be a guarantor of *all* checks issued to plaintiffs, not just those where a specific intent to defraud could be shown.