LAWRENCE R. CONDON, as Executor of JOSEPH FAROLL, Deceased, et al., Formerly Doing Business under the Firm Name of JOSEPH FAROLL & Co., Now in Liquidation, Respondents-Appellants, *v.* NATIONAL SURETY CORPORATION, Appellant-Respondent.

NATIONAL SURETY CORPORATION, Third-Party Plaintiff, *v.* SUTRO BROS. & Co., Third-Party Defendant.

First Department, December 22, 1964.

*Stewart Maurice* of counsel (*Maurice, McNamee & White*, attorneys), for appellant-respondent.

*Abraham Hornstein* of counsel (*Lawrence R. Condon*, attorney), for respondents-appellants.

WITMER, J. From a judgment in the sum of $278,044.91 in favor of plaintiffs as successors to Faroll & Co., brokers (hereinafter referred to as Faroll) against the defendant, National Surety Corporation (National), entered February 25, 1964, both parties appeal upon several grounds. Because of our conclusion that the judgment must be reversed and the complaint dismissed upon the ground that subdivision (g) of section 1 of the bond upon which the action is founded excludes coverage for the transactions out of which this action grew, we do not reach the points urged by plaintiffs for increasing the amount of the judgment nor the other grounds for reversal asserted by defendant National.

It appears that at all times here involved Faroll, a stock brokerage firm, had two Broker Blanket Bond Insurance policies, each in the sum of $250,000 issued to it by National. It was provided in said policies that

" THE FOREGOING AGREEMENT IS SUBJECT TO THE FOLLOWING CONDITIONS AND LIMITATIONS:

" Section 1. This Bond Does Not Cover:

\* \* \*

" (g) Any loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, in the name of the Insured or otherwise, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, except when covered under Insuring Clause (A), (D) or (E)."

The excepted insuring clauses referred to above are, (A), for loss through dishonest acts of employees; (D), for loss through forgery; and (E), for loss through acts with respect to securities which have been forged or stolen, etc. Such exceptions are not applicable in this case.

Faroll's loss arose in the following manner: One Gould, in Canada, acquired the stock of C corporation by improperly using and exhausting most of its assets and drastically reducing the real value of such stock. Through a few small transactions he gained the confidence of Faroll. He then telephoned Faroll and advised it that he had several clients (naming them) who wished to sell good stocks of specified American corporations at specified prices, or better, having a value of several hundred thousands of dollars, and he also asked Faroll to buy for said clients more than 140,000 shares of the stock of C corporation at market prices. He assured Faroll that he would forward to it promptly the stocks to be sold. In reliance upon Gould's honesty and good faith Faroll immediately began selling the specified stocks in said Amercian corporations without having received the certificates of the shares from Gould; and Faroll also began buying the shares of C stock at market prices with its own funds, with the expectation that Gould and his clients would reimburse Faroll and upon the assumed security of the proceeds to be received upon the sale of the American stocks. As Faroll bought the C stock, Gould, through friends or dummies and brokers, fed his C stock into the market and was paid therefor.

After a few days, when Gould failed to deliver to Faroll the certificates of stock in the American corporations to cover the sales thereof, Faroll learned that it had been defrauded. It "went into the market" and bought the necessary shares to cover what had turned out to be "short" sales of the American stocks. Finding that neither Gould nor his alleged clients wanted or could pay for the C stock which Faroll had purchased for them, Faroll sold it at a great loss. In this action plaintiffs, as successors to Faroll, asked the defendant National to cover the loss thus sustained. National declines to oblige in this respect, and among other defenses asserts that Faroll sustained the loss through "trading", which is expressly excluded from coverage under the policy, subdivision (g) of section 1 above quoted.

Plaintiffs contend that the foregoing transactions, procured by Gould's fraud, did not amount to "trading". They take the position that in executing the orders for Gould they were merely acting as his agent and were not engaged in buying or selling in any fair sense, and that they had no intention of buying or selling such stocks on their own behalf, so as to amount to "trading". On the other hand, National takes the position that the clause excluding coverage for trading losses

was inserted precisely to avoid responsibility by the surety for what occurred in this case — action by a broker without credit investigation and without first obtaining the certificates of stock to be sold, or advance payment by the client for the stock to be purchased; that the type of bond issued in this case is not designed to save the broker from the need to investigate and exercise due care concerning the honesty and financial stability of its customers. National contends that to adopt plaintiffs' interpretation of the term '' trading '' in the exclusionary clause of the bond would virtually make it a guarantor of the good faith and financial soundness of every customer of its insured brokers; that it did not intend to and did not contract to assume the risk which plaintiffs seek to place upon it; and that plaintiffs have not paid a premium for protection from such risk.

For upwards of 35 years various courts in this country have uniformly held that activities such as Faroll engaged in herein constitute '' trading '' within the meaning of the exclusionary clause of the policy, subdivision (g) of section 1, or similar provisions. The Supreme Court of Massachusetts made such holding in 1927. (*Harris* v. *National Sur. Co.*, 258 Mass. 353.) Later in the same year this court made a like determination. (*Kean* v. *Maryland Cas. Co.*, 221 App. Div. 184, 191, affd. 248 N. Y. 534.) In 1934 two similar holdings were made in California. (*Earl* v. *Fidelity & Deposit Co.*, 138 Cal. App. 435, 440; and *Rath* v. *Indemnity Ins. Co.*, 2 Cal. App. [2d] 637.) In *Degener* v. *Hartford Acc. & Ind. Co.* (92 F. 2d 959, 960 [1937]) the court affirmed on another ground after quoting with seeming approval from the opinion below by the District Judge as follows: '' The word ' trading,' as used, means the operation of the usual occupation of buying and selling stocks. In this connection it must not be forgotten that a stockbroker differs from the ordinary broker who is merely a conduit between buyer and seller. The stockbroker buys the stock with his own money, thereby becoming a creditor of the buyer as well as a trustee of the stock. The loss of plaintiffs resulted from trading — a fictitious trading and without the knowledge of the insured, it is true, but still the trading contemplated by the bond.''

In *Paddleford* v. *Fidelity & Cas. Co. of N. Y.* (100 F. 2d 606, 610–611 [1938]) the court held that the fraudulently induced brokerage transactions constituted '' trading '' within the terms of the policy provisions, but on another ground found that the plaintiff was protected by the policy.

In *Roth* v. *Maryland Cas. Co.* (209 F. 2d 371 [1954]) the court disapproved of the other ground upon which the *Paddle-*

*ford* case (*supra*), was decided, but the court held that the broker's acts constitute "trading" within the exclusionary clause of the policy, and at page 374 the court referred with approval to the opinion of the District Judge quoted in the *Degener* case (*supra*).

The latest case on the subject to come to our attention is *Sade* v. *National Sur. Corp.* (203 F. Supp. 680 [1962]). In that case through the fraud of S, plaintiffs-brokers bought stock for S on his representation that he could pay for it and that his check was good. The representation proved to be false, and plaintiffs were required to pay for the stock themselves; and they then sold it at a loss, for which they sought to collect from their surety on a "Brokers Blanket Bond" like the one in the case at bar. The court held that the clause excluding coverage for "trading" barred plaintiffs from recovery.

The case of *Cohon* v. *United States Fid. & Guar. Co.* (172 Misc. 51, affd. without opinion 259 App. Div. 707) is not in point because the acts out of which the losses arose therein were far different from those in the case at bar, as was also the exclusionary clause in the bond. There, a faithless employee, presumably to obtain commission credits, claimed to have sold stocks owned by his broker employer; and the latter believed him and relied thereon. It was pointed out in the testimony that the sales, had they been made, would have been much like those by a grocer selling cans of goods for later delivery. In fact, the employee had not made such sales, and when the stocks dropped in price the employer suffered losses. The court held that such acts of the employee did not constitute "trading"; and it set aside a verdict for the defendant surety as contrary to law and against the weight of the evidence. It should also be noted that, unlike the bond in the *Cohon* case, the exclusionary clause in the bond in the case at bar expressly excepts losses caused by dishonesty and forgery of employees; and had this bond been in effect in the *Cohon* case, the plaintiff would have been protected, and the court would not have been required to consider whether the employee's acts constituted "trading".

No case has come to our attention which holds that acts like those of Faroll in this case do not amount to "trading" within the meaning of the exclusionary clause of the Brokers Blanket Bond. For many years surety companies and stockbrokers have had reason to know and expect that a surety bond containing such exclusionary clause gives no coverage with respect to transactions like those involved herein. We hold, therefore, that Faroll's acts constituted "trading" within the meaning of said exclusionary clause.

We find no merit in plaintiffs' contention that National failed to except to the trial court's rulings on the submission to the jury of the provision of the policy in question. National expressly asked the court to charge that plaintiffs' loss resulted from "trading", and duly excepted to the court's refusal to so charge.

The judgment below should, therefore, be reversed and the second amended complaint dismissed, with costs.

EAGER, J. (dissenting). I disagree with the specific holding of the majority that, as a matter of law, the loss of the brokers in the particular transactions occurred "from trading". In my opinion, as stated in *Cohon* v. *United States Fid. & Guar. Co.* (172 Misc. 51, 54), "the term ' trading ', as used in the policy, is to be construed in a technical rather than a broad sense * * * if for no other reason than that the rule of strict construction requires an interpretation most favorable to the insured." This case was affirmed here without opinion (259 App. Div. 707), even though, as noted in its briefs, the defendant-appellant there strongly relied on the case of *Harris* v. *National Sur. Co.* (258 Mass. 353) for the proposition that the word " trading " should be accepted in its ordinary sense and for a claim of alleged error in the receipt by the trial court of expert testimony as to the meaning of the word. This court, however, in affirming, apparently rejected these contentions of the defendant-appellant.

The holding of the *Cohon* case makes good sense because we are dealing with " trading " in a specialized field and not with " trading " as ordinarily understood. The meaning of the word " trading ", as used in the particular clause, is properly the subject of expert testimony and other proofs. Therefore, I submit that the question may not be determined as one of law upon the record here.

Furthermore, assuming *arguendo* (but with this I do not agree) that the term " trading ", independent of proofs, is to be construed in its " well accepted meaning, i.e., any transaction involving the purchase and sale of a commodity "— and that the word " as used in the bond has its ordinary meaning " (quotes are from defendant's brief), then, in any event, the loss sustained here was not a loss resulting " from trading ". To trade is to buy and sell a particular item or items, and the loss is the *difference* between the purchase price and the sale price of the *particular item or items*. Such would be a loss " from trading ".

Here, the loss occurred and resulted from a fraudulent and larcenous scheme promoted by one Gould, a resident of Canada, who induced the brokers to use their own moneys to pay for his almost worthless Canadian stock. Market transactions (the purchase of the stock on the market) were incidentally involved, but neither Gould nor the brokers were " trading " in the stock within the ordinary meaning of the word. Thus, unless the word has some special meaning, the resultant loss to the brokers was not a loss " *from* " trading.

Finally, since there is a question as to the meaning of the word " trading ", and the exclusionary clause, read as a whole, is ambiguous, the burden of proof was upon the defendant to bring the transactions within the clause. " To sustain the construction of an exclusion provision in a policy as urged by the insurer, the insurer has the burden of establishing that the words and expressions used not only are susceptible of that construction, but that it is the only construction which can be fairly placed thereon." (29 N. Y. Jur., Insurance, § 623, p. 616. See, also, *Sincoff* v. *Liberty Mut. Fire Ins. Co.,* 11 N Y 2d 386, 390.) At the very least, from the defendant's standpoint, the question involved was one which depended upon proofs and which would be required to be submitted to the jury. The rule is that " where the meaning of certain terms used in the policy is ambiguous and disputed, the evidence as to their true meaning shall be left to the jury." (46 C. J. S., Insurance, § 1368, p. 600. See, also, *Lachs* v. *Fidelity & Cas. Co. of N. Y.,* 306 N. Y. 357; 17A C. J. S., Contracts, § 621, p. 1259.) Accordingly in any event, this court should not dispose of the question as a matter of law. If the case is to turn upon the construction and effect of the particular exclusionary clause and the evidence is insufficient or the record is unclear, then, the case should be remanded for a new trial with the question to be submitted to the jury on presentation of proper evidence.

Botein, P. J., Rabin and Valente, JJ., concur with Witmer, J.; Eager, J., dissents in opinion.

Judgment reversed upon the law and upon the facts, with $50 costs to defendant-appellant-respondent, and the second amended complaint dismissed.