**SUTRO BROS. & CO., Plaintiff-Appellant,**

v.

**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, Defendant-Appellee.**

No. 43, Docket 31218.

United States Court of Appeals Second Circuit.

Argued Sept. 26, 1967.

Decided Dec. 11, 1967.

Marvin Schwartz, New York City, (Sullivan & Cromwell, John F. Cannon, New York City, on the brief), for appellant.

Alfred J. Morgan, Jr., New York City, (Bigham, Englar, Jones & Houston, Robert B. Budelman, Jr., New York City, on the brief), for appellee.

Before MOORE, SMITH and KAUFMAN, Circuit Judges.

MOORE, Circuit Judge:

Sutro Bros. & Co. (Sutro), plaintiff, appeals from a judgment dismissing its complaint against Indemnity Insurance Company of North America (INA), defendant.[1] The controversy arose over the construction of a provision in an indemnity bond issued by INA in favor of Sutro. The issue is whether the facts are such as to create liability under the bond.

*The Bond*

INA issued to Sutro, a brokerage firm, its standard Brokers' Blanket Bond, Form 14 (the Bond), to cover such losses as might be sustained by Sutro because of larceny, theft and misappropriation. More specifically, the clause of the Bond relied upon by Sutro to establish liability reads:

"In Transit

"(C) Any loss of Property (occurring with or without negligence) through robbery, common-law or statutory larceny, embezzlement, misappropriation, theft, holdup, misplacement, mysterious unexplainable disappearance, being lost or otherwise made away with, damage thereto or destruction thereof, and any loss of subscription, conversion, redemption or deposit privileges through the misplacement or loss of Property, while the Property is in transit anywhere in the custody of any person acting as messenger or in the custody of any armored motor vehicle company, except while in the mail and while being transported by express or as freight after receipt of the Property by a carrier for hire other than an armored motor vehicle company, such transit to begin immediately upon receipt of such Property by the transporting person or company, and to end immediately upon delivery thereof at destination."

Another provision of the Bond must also be read in connection with Sutro's claim. This paragraph provides:

"(e) Any loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, in the name of the Insured or otherwise, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, except when covered under Insuring Clause (A), (D) or (E)."

*The Issue on Appeal*

The facts, therefore, must be examined in the light of the above provisions to determine (1) whether the loss sustained resulted from common-law or statutory larceny, misappropriation or theft while the property was in transit anywhere in the custody of any person acting as a messenger, the transit "to end immediately upon delivery thereof at destination"; or (2) whether the loss resulted "directly or indirectly from trading * * * whether or not represented by any indebtedness or balance shown to be due the Insured [Sutro] on any customer's account, * * *."

I.

*The Business Background*

The business transactions which gave rise to Sutro's claim under the Bond consisted of the purchase by Sutro for the account of its customer, Arlee Associates, Inc. (Arlee), of various securities ordered by Arlee. The principals of Arlee were Arthur Katz (Katz) and Leo Sinsheimer (Sinsheimer).

Since May 1958 and for over two years, Sutro had had business transactions with Katz and Sinsheimer in their names and in the names of certain of their corpora-

1. The suit, originally commenced in the New York Supreme Court was removed by INA to the United States District Court for the Southern District of New York on the ground of diversity of citizenship.

tions. Katz and Sinsheimer financed security purchases for customers of Sutro and, also, purchased and sold securities through their accounts with Sutro.

In May 1960 the New York Stock Exchange suggested to Sutro that it close all accounts with Katz and Sinsheimer. Despite this warning, Sutro resumed business with Katz and Sinsheimer, who conducted this business under the name of Arlee. Between August 1960 and June 1961, some 950 purchase orders from Arlee for securities valued at some $13,400,000 were executed and confirmations were mailed on the day the orders were executed.

### The Arlee-Sutro Transactions

On the delivery date (customarily four days after purchase), Sutro delivered the stock certificates by messenger to Arlee in New York City in the forenoon against Arlee's receipt therefor. The receipt states:

"Receipt is hereby acknowledged of the described securities which Sutro Bros. & Co. have declared to us in advance of payment therefor, solely for the purpose of enabling us to inspect and verify the same. Title thereto passes to us only against receipt by Sutro Bros. & Co. of payment therefor, but all risks to such securities, including risk of loss, are assumed by the undersigned."

In the afternoon of the same day the messenger returned and received Arlee's uncertified check for the amount of the purchase orders. Within one day of its purchase order, Arlee sold the same securities through other brokers. When Arlee received the securities from Sutro's messenger, it delivered them to its selling brokers. Arlee received from these brokers a certified check on a New York City bank which it could collect immediately. The check given to Sutro's messenger, on the other hand, was drawn on a suburban bank and took as long as four days to clear. Arlee thus had the use of large amounts of money until a deposit was required at the suburban bank to cover the checks given to Sutro. The "float" which was thereby created eventually exceeded one million dollars.

Originally, Sutro's managing partner had approved the receipt of up to $25,000 daily of Arlee's uncertified checks, but during the period of August 1960 to May 1961, Sutro actually accepted from Arlee some 838 uncertified checks without regard to amount. Of this number, the last 63 checks were not collected because Arlee had stopped payment thereon. The amount of the loss has been stipulated to be $1,137,775.54. Sutro made a claim under the Bond for the loss sustained. INA rejected the claim on the ground that it was not covered under the Bond.

The proceedings by the Securities and Exchange Commission (SEC) against Arlee, Sutro and its managing partner and the criminal charges against Katz and Sinsheimer who pleaded guilty and received prison sentences are noted but only the facts giving rise to such proceedings are here considered.

### The Bond

On its face, the Bond would appear clearly to express its coverage and its limitations, namely, to insure against loss while property was in Sutro's possession or "in transit." By Bond definition, transit was to begin immediately upon receipt of the property by Sutro's messenger and was "to end immediately upon delivery thereof at destination." And this is exactly what occurred. Not a single certificate was lost "through robbery, common-law or statutory larceny, embezzlement, misappropriation, theft, holdup, misplacement, mysterious unexplainable disappearance, being lost or otherwise made away with, damage thereto or destruction thereof * * *." The cause of the loss is equally clear—Arlee did not pay for the securities which Sutro had delivered to it.

Conversely, the Bond excluded any loss, direct or indirect, resulting from trading, whether or not represented by an indebtedness or balance due to Sutro on any customer's account. And this is exactly the situation here.

In an effort by Procrustean methods to fit the facts to the Bond coverage, Sutro argues that it was Arlee's intention to steal the securities and that such intent is established by the check-kiting practices of Arlee. Sutro points to Arlee's insolvency, to the fact that check-kiting gives rise to civil and criminal liability and to violations of mail fraud statutes and to the guilty pleas of Katz and Sinsheimer in the criminal proceedings. But these facts do not establish liability under the Bond. The "in transit" provision of the Bond is primarily concerned with such perils as might thwart delivery. Here delivery of all the securities had been made— they were no longer "in transit." Sutro contends that the securities were unlawfully taken by trick or device, namely, by the giving of uncertified checks against accounts containing inadequate funds to meet them, and that until they were validly paid for, they were still "in transit." But it must be remembered that Sutro had been willing to deliver the securities as a regular and accepted course of business against 838 uncertified checks of which 775 were paid. But for the fact that every Ponzi-type scheme has its ultimate breaking point, the 63 checks might have been paid, leaving to others in the future the role of being the victims of the swindle. Therefore, Sutro's assertion that "Arlee's theft occurred while the securities were in transit" (Brief, Pt. II) cannot be accepted. The district court properly held that, if theft there were, it did not occur in transit. This conclusion is supported by the fact that there would have been no "theft" until days later and even then the existence of a "theft" would have been dependent on the collectibility of the check. After all, 775 checks had been collected.

A review of the entire record supports the trial court's conclusion that Sutro had failed to show by a fair preponderance of the credible evidence that "when, or before, Arlee received the securities from Sutro, Arlee intended to steal the certificates." (Finding 21.)

## II.

This being a diversity case, the question arises: what New York law, if any, is applicable to the facts here presented? Sutro argues that decision here is controlled[2] by the *Hanson* and *Underwood* cases.[3] In those cases, the New York Court of Appeals faced the problem of construing bonds, substantially the same as the Bond here, in the light of the specific facts before that Court. No semantic distinctions between "transit" *(Underwood)* and "transit risk" *(Hanson)* will be relied upon because a much firmer footing on a factual foundation is available.

In *Underwood* a salesman employed by the insured broker delivered bonds to the broker's customer against a check which bore a false and incomplete certification. The New York Court of Appeals chose to regard this securing of possession by the customer as a larceny by trick and device equivalent to a taking as "if he had grabbed Del Re by the throat and taken the bonds from his custody," (245 N.Y. at 115, 156 N.E. at 634) and hence held that the loss was covered by the robbery and theft provisions of the policy.

In Hanson the messenger delivered securities to Baran & Co. against a receipt similar to the Arlee receipt, but when the messenger returned for the check in the afternoon, he found that Baran & Co. had abandoned its office and had absconded with the securities. The Court of Appeals assumed that "both before and at the time when the pretended purchaser obtained possession of the securities he had the fraudulent intent to convert them." (257 N.Y. at 220,

2. Under the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

3. Hanson v. National Surety Co., 257 N.Y. 216, 177 N.E. 425 (1931); Underwood v. Globe Indemnity Co., 245 N.Y. 111, 156 N.E. 632 (1927).

177 N.E. at 427.) The Court held this to be larceny; that "the plain intent of the bond was to furnish protection against loss by larceny through a felonious taking of possession from the messenger" (id.); and completed the syllogism by holding that the bond covered such a loss.

An important factual difference is immediately observed. In *Underwood* and *Hanson* there were single transactions with deliveries by no means in the manner anticipated. Here the deliveries were completed in exactly the manner approved by Sutro—expressly by Friedman and impliedly by the knowing acceptance of some 838 uncertified checks. The loss was not occasioned by the taking of the delivered securities which Arlee forthwith turned into cash but by the subsequent non-payment of the checks which Sutro was satisfied to accept at the time.

The surety here, INA, is probably little interested in the confessed admissions of guilt by Katz and Sinsheimer in the criminal case against them. The Bond does not cover their personal misconduct. A fair diagnosis of the Sutro-Arlee relationship reveals a customer's account with many transactions over a substantial period of time which by reason of an ultimate non-payment of a debit balance caused Sutro's loss.

Few factual situations can be cut into such a stencil as will fit contract clauses with the nicety of geometric congruous triangles. Were this so, there would be no lawsuit to decide. The problem is: which clause, the inclusionary ("C") or the exclusionary ("(e)"), more closely fits the facts because the Bond as such has no meaning except as related to the facts which give rise to the claim. Assuming the intent to defraud theories of *Underwood* and *Hanson* were justified on the facts presented by those cases, the facts of this case do not fit into the same mold. The 838 transactions were evidence of an accepted business practice. A scheme to take the last 63 deliveries with larcenous intent—in contrast to the other 775—cannot be imputed to Katz and Sinsheimer by hindsight. The conclusion must, therefore, be reached that the Bond in the light of its words and Sutro's conduct does not cover the losses sustained.

The task of speculating as to how the New York courts would decide this case, as mandated by *Erie,* remains. In a field in which even slight factual differences create substantially different legal conclusions and in a search for that "educated guess" as to New York law, other New York decisions cannot be ignored.

[redacted] Much that was said in the Appellate Division opinion in Condon v. National Surety Corp., 22 A.D.2d 305, 254 N.Y.S.2d 620, aff'd without opinion, 16 N.Y.2d 775, 262 N.Y.S.2d 499, 209 N.E.2d 819 (1965) is apposite—particularly as to "trading" (fictitious there to be sure) and as to due care in investigating the financial stability of customers. In Kean v. Maryland Casualty Co., 221 App.Div. 184, 223 N.Y.S. 373 (1st Dept., 1927), aff'd without opinion, 248 N.Y. 534, 162 N.E. 514 (1928) an uncertified check given in purported payment for bonds was dishonored. The court (221 App.Div. at 191, 223 N.Y.S. at 381) noted that the "transaction" was "a part of the running account" and concluded that "The loss, therefore, whether regarded as arising directly or indirectly, clearly grew out a trading account." See also Sade v. National Surety Corp., 203 F.Supp. 680 (D.D.C.1962), aff'd 114 U.S. App.D.C. 281, 314 F.2d 286 (1963).

The conclusion is reached that New York law today would support a decision of non-liability under the Bond on the facts here presented.

Judgment affirmed.

J. JOSEPH SMITH, Circuit Judge (concurring in the result):

I concur in the result. I would not find it necessary to speculate on the New York definition of larceny as applied to these facts. In view of *Hanson* and *Underwood* and the possible effects on the criminal aspects of such a situation,

I am not at all sure the New York courts would not hold this to be larceny. I do agree, however, that the complaint was properly dismissed on the ground that coverage was lacking in view of the "trading" exclusion (e) in the policy.