**OCEAN ACCIDENT & GUARANTEE CORPORATION, Limited, v. OLD NAT. BANK.**

(Circuit Court of Appeals, Sixth Circuit. April 10, 1925.)

No. 4131.

1. **Insurance ⬅163(½)—Indemnity bond, insuring bank against loss by theft of certain designated property and "other similar securities" held applicable to bills of lading.**

Indemnity bond, insuring bank against loss by theft of "money, currency, bullion, bonds, debentures, scrip, certificates, warrants, transfers, coupons, bills of exchange, promissory notes, checks, or other similar securities," *held* applicable to bills of lading; such bills of lading, being "other similar securities" within the bond.

2. **Insurance ⬅146(3)—Indemnity bond construed most strongly against insurer.**

Indemnity bond insuring against theft, will be construed most strongly against insurer.

3. **Insurance ⬅425—Indemnity policy held to include loss by voluntary payment without adjudication of liability of value of bills of lading stolen.**

Indemnity bond, insuring bank against loss by theft of certificates, bills of exchange, notes, checks, "or other similar securities, * * * for which it [bank] is legally liable," *held* to include loss sustained by voluntary payment to owners of bills of lading stolen from bank without adjudication of its liability.

4. **Insurance ⬅425—Substitution of fictitious bills of lading for genuine bills attached to drafts during inspection by drawee's bookkeeper held "theft," within indemnity bond.**

Loss sustained by bank, when collector presented bills of lading with drafts attached to drawee's bookkeeper, who without collector's knowledge detached bills during inspection thereof, and attached fictitious bills, *held* loss by "theft," within indemnity bond, where felonious intent existed when documents were handed to bookkeeper.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Theft.]

5. **Insurance ⬅425 — Loss through theft of bills of lading held sustained while bills of lading were "in transit."**

Loss sustained by bank when collector presented bills of lading with drafts attached to drawee's bookkeeper, who without collector's knowledge detached bills during inspection thereof, and attached fictitious bills, *held* due to theft of bills while "in transit," within indemnity bond.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, In Transit.]

6. **Insurance ⬅425—Conviction of drawee for forgery of bills of lading substituted for genuine bills attached to drafts held not conclusive that bank's loss was effected by means of forgery.**

Where drawee's bookkeeper, to whom bank's collector presented bills of lading with drafts attached for inspection, detached genuine bills of lading and attached forged bills, loss was not effected through forgery, within provision excepting such loss, and drawee's conviction for forgery was not conclusive that it was.

7. **Insurance ⬅425—Bills of lading, handed by bank collector to drawee of attached drafts for inspection, were not delivered to bookkeeper, within provision of indemnity bond.**

Where drawee's bookkeeper, to whom bank's collector handed bills of lading with drafts attached for inspection, detached genuine bills, and substituted fictitious ones, the loss was not within provision of indemnity bond exempting insurer from liability in case of theft by one to whom employé delivered property, since bills of lading, though actually in the hands of the bookkeeper, were not out of collector's possession.

In Error to the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

Suit by the Old National Bank against the Ocean Accident & Guarantee Corporation, Limited. Judgment for plaintiff, and defendant brings error. Affirmed.

Stuart E. Knappen, of Grand Rapids, Mich. (Knappen, Uhl & Bryant, of Grand Rapids, Mich., on the brief), for plaintiff in error.

Edgar H. Johnson, of Grand Rapids, Mich. (Travis, Merrick, Warner & Johnson, of Grand Rapids, Mich., on the brief), for defendant in error.

Before DENISON, DONAHUE, and MOORMAN, Circuit Judges.

MOORMAN, Circuit Judge. The Old National Bank of Grand Rapids, Mich., defendant in error, brought this suit against the Ocean Accident & Guarantee Corporation, of London, England, plaintiff in error, to recover under an indemnity bond issued December 31, 1920, and renewed December 31, 1921, with amendment in form of rider, the value of 64 bills of lading which the bank had received, with attached drafts for collection, and which it had lost through the acts of W. L. Wellman Company. The case was tried before the court, and judgment rendered for the bank in the sum of $72,596.86, with interest at 5 per cent. per annum from March 9, 1922. $10,975.34 of this loss occurred in December, 1921.

The facts in the case are simple. E. L. Wellman Company was engaged in the grain business in Grand Rapids, and the Old National Bank for some time prior to the matters complained of had received daily an average of 8 or 10 drafts, with attached

4 F.(2d)—48

bills of lading, on the Wellman Company. Some of them were paid on presentation; others were not. From the beginning of the period in which this loss occurred there was an accumulation of drafts that had been presented and not paid. When the drafts were received by the bank, its custom was to fold the bill of lading with the face inside, and pin it to the draft. The accumulated drafts were kept in a package between cardboards. The new drafts, as they came in, were placed on the outside of the cardboards, with a rubber band around all of them.

Carlton Blomley, the collector for the bank, daily took this package to the Wellman Company to present the drafts for payment. They were presented to Arthur Drueke, the bookkeeper and cashier of the company, in the front office of the suite of rooms occupied by that company. In this room there were two high desks and the telephone switchboard. The bookkeeper was usually behind his desk, and, upon presentation by the collector, would sometimes say, "Let me look at them," and take the package, go over the drafts and bills of lading, and, for the ostensible purpose of checking the bills with invoices in another room, would take some of the drafts and bills out of the room. He would then bring them back, and, if he did not want to pay any of the drafts, would say, "I don't want any to-day," or "Hold them," handing the package to the collector; if he wanted to pay any of them, he would do it, keep the corresponding bills of lading, and hand the others to the collector, to be returned to the bank.

Blomley did not know just how many of the drafts and bills, or whether all of them, were taken out of the room on any particular occasion. He usually sat in a chair below the desk near the switchboard, and was not in position to see what Drueke did. Either while Drueke had the drafts and bills in the next room, or after he had returned to his desk, he detached the bills he wanted, and in their stead attached to the drafts regular forms of the same color, folded face inside, partially or completely filled out as the true bills. All unaccepted drafts having been returned to the collector, and the forms attached to them being exteriorly identical in appearance with the true bills, he, as well as the collecting teller of the bank, assumed that the fictitious bills were genuine.

To avoid detection the Wellman Company paid the drafts with the fictitious bills of lading attached when tracers for those drafts were received by the bank. Funds to make these payments were procured by abstracting other bills, effecting delivery of the cars, reselling them, and depositing the proceeds of those sales to the company's account. In this way the fraudulent practice was concealed for more than a year. Hence, the accumulation of fictitious bills in December of 1921. After discovery of these frauds, the Old National Bank paid to the owners of the original bills of lading the value thereof, without adjudication of liability.

This action is to recover the amounts so paid, with interest. It is the contention of the bank that the loss is covered by the following language in the policy:

"The underwriter [the defendant] hereby undertakes and agrees to indemnify the insured and hold it harmless from and against any loss, to an amount not exceeding one hundred thousand and $^{00}/_{100}$ ($100,000) dollars, of money, currency, bullion, bonds, debentures, scrip, certificates, warrants, transfers, coupons, bills of exchange, promissory notes, checks, or other similar securities, hereinafter referred to as property, in which the insured has a pecuniary interest, or for which it is legally liable, sustained by the insured subsequent to noon of the date hereof, and while this bond is in force, and discovered by the insured subsequent to noon of the date thereof and prior or to the expiration of 12 months after the termination of this bond as provided in condition II."

"(C) Through robbery, hold-up, or theft, by any person whomsoever, while the property is in transit within 20 miles of any of the offices covered hereunder and in the custody of any of the employés, or through negligence on the part of any of the employés having custody of the property while in transit as aforesaid."

Liability under this provision is denied by the insurance company on various grounds hereafter to be noted; and it further relies upon clauses 2 (a) and 2 (f) of the policy, the latter being in the rider of December 31, 1921, which, it contends, specifically exclude liability.

[1] It is the first contention of the insurance company that bills of lading are not included in the indemnity given. In this particular the bond undertakes to hold the insured harmless from and against loss of several denominated kinds of property or other similar securities. Bills of lading are not mentioned, and cannot, in our opinion,

be imported into the specific designations. But the general words, "other similar securities," were manifestly intended to mean something in addition to the specific words; i. e., other property, differing in name and some of its features from that described—as, for example, warrants differ from coupons—but possessing the same general characteristics as some of the securities mentioned. A bill of lading, in many of its essential characteristics, is similar to the other securities specifically mentioned, and for that reason the court below held, and we think rightly, that it was included in the general words.

[2, 3] Another contention of the company is that the bank has not sustained a recoverable loss, because it voluntarily paid to the owners of the bills of lading the value thereof, without an adjudication of its liability —such an adjudication being, as it contends, a prerequisite to the bank's right to recover on the policy. Disregarding the provision which imposes liability for loss of property "in which the insured has a pecuniary interest," the pertinency of which we do not decide, the question turns on the clause "for which it is legally liable," qualifying, as we construe it, the property described. The clause obviously refers to property of others in the custody of the bank. Interpreting this clause more strongly against the insurer, as authorized in Liverpool & London & Globe Insurance Co. v. Kearney, 180 U. S. 132, 21 S. Ct. 326, 45 L. Ed. 460, and considering it in conjunction with the requirements of the policy as to giving notice, making proofs of loss within 90 days, and bringing suit within one year, compliance with which was necessary to protect the indemnity, it seems certain that the words refer to a condition in which the insured would be subjected to claims or demands and out of which a legal liability might arise, and not to an adjudged liability. Home Insurance Co. v. Peoria & Pekin Union Ry. Co., 178 Ill. 64, 52 N. E. 862.

The efficacy of the bond as determined by the means effecting the loss depends on clause (C). Excluding, as immediately unimportant, any contingent theory of negligence on the part of the bank's employé having custody of the property, the loss, according to this clause, must have occurred "through robbery, hold-up, or theft." The first two terms being inapplicable to the facts disclosed in evidence, the liability, if it exists, is reduced to the hypothesis of "theft" while the property was "in transit within 20 miles of any of the offices," etc.

[4] Was Drueke's taking of the bills theft or embezzlement? It is argued that it was not theft, but embezzlement, since theft is the fraudulent taking and involves unlawful acquisition, whereas embezzlement is the fraudulent conversion after possession has been lawfully acquired. This legal distinction, as stated, is uniformly recognized in the authorities. But we are unable to concur in the view that there was not a fraudulent taking, for the evidence shows a felonious intent on the part of Drueke, at the time the bills were handed to him, to convert them, or such of them as he wanted, to his own use. The consummation of this purpose was larceny. Commonwealth v. O'Malley, 97 Mass. 584; Finkelstein v. State, 105 Ga. 617, 31 S. E. 589; Morton v. Commonwealth, 159 Ky. 231, 166 S. W. 974, 52 L. R. A. (N. S.) 1222, and authorities cited.

[5] Co-ordinately important with the question just disposed of is the one of whether the bills were in transit. We think they were. It is true they were placed in Drueke's hand to enable him to examine them and determine whether he would pay the drafts; but a delivery was not effected, and was not to be effected unless and until the drafts were paid. It was the duty of Blomley to present the drafts for payment and give the Wellman Company an opportunity to determine whether it would pay them. This could not be satisfactorily done without permitting a comparison of the bills with the invoices. Blomley did not part with the possession of the bills; he merely presented the drafts for acceptance, and both he and Drueke understood that, unless accepted and paid, they, with the attached bills, were to be returned to the bank. There was not, in these circumstances, a diversion of the transit in regular course.

[6] E. L. Wellman was convicted of forging and counterfeiting bills of lading that were substituted for some of those taken by Drueke. Wellman v. United States (C. C. A.) 297 F. 925. From that fact it is argued that the affirmative defense based on condition 2(a) of the bond, excluding liability if the loss directly or indirectly was effected by means of forgery, was conclusively established. We do not think the decision in the criminal case decisive of, or even pertinent to, the question here. It did not purport to decide directly or inferentially by what means the loss was effected. The evidence in this case shows that it resulted solely from the taking of the bills. The substitution of forms of bills, partially or completely filled out like the originals, was to prevent discov-

ery of the theft. The substitutions did conceal the theft, but the forgeries on the forms, which were never seen by any agent or employé of the bank, not only did not cause the loss, but did not even assist in concealing the theft. Accordingly the loss was neither directly nor indirectly effected by them.

[7] Nor do we regard as applicable condition 2 (f) added by the rider to the policy of December 31, 1921, to the effect that liability would not attach to loss through larceny or theft "committed by any person to whom any employé shall have otherwise than through dishonesty delivered the property or extended credit," because, as observed in our discussion of the analogous question raised by the term "in transit," Blomley never divested himself of the possession of the bills. They were handed to Drueke to permit him to examine them, check them with the invoices, and decide whether he wanted delivery effected upon the payment of the drafts. But they were not out of the possession of Blomley, though actually in the hands of Drueke. To hold that the clause is not controlling under the facts in this case, it is not necessary to define "delivery" as a transfer of title, for Blomley transferred neither the title nor the possession.

The judgment is affirmed.