**MOUNT VERNON BANK AND TRUST COMPANY, Plaintiff,**

v.

**The AETNA CASUALTY AND SURETY COMPANY, Defendant.**

Civ. A. No. 2714.

United States District Court
E. D. Virginia,
Alexandria Division.

Dec. 19, 1963.

Eldridge K. Hayes, Alexandria, Va., for plaintiff.

Preston C. King, Jr., Washington, D. C., and Fred C. Alexander, Jr., Alexandria, Va., for defendant.

LEWIS, District Judge.

In this action the Mount Vernon Bank and Trust Company seeks a judgment against the defendant for "loss" allegedly covered by the terms of the banker's blanket bond issued by The Aetna Casualty and Surety Company.

The insurance carrier says that its bond does not cover the claimed loss, and, even if so, the plaintiff failed to give prompt notice and to furnish proof of the alleged loss, with full particulars,

within the period provided for in the bond. For additional defenses the carrier alleges negligence on the part of the bank officers—estoppel—and the release of Barbara Ann Heffernan.

The material facts are not in dispute, all of which were by stipulation with the exception of the live testimony of Andrew W. Clarke, the president of the plaintiff bank. The Court's findings are as follows:

John V. Heffernan, a former resident of Fairfax County, Virginia, died domiciled there March 1, 1958, leaving a last will and testament dated April 24, 1957. His daughter Martha Heffernan Farrell was appointed executrix March 11, 1958. The estate, valued at $90,000.00, included United States Government bonds (Series G) in the amount of $36,000.00, part of which ($12,000.00) was payable to the executrix and part of which ($24,000.00) was payable to Barbara Ann Heffernan, the deceased's other daughter. The two daughters were also the residuary beneficiaries of the will.

Under date of March 10, 1958, Martha Heffernan Farrell, executrix and trustee under the will for her sister Barbara Ann, Michael J. Farrell, her husband, and their minor daughter went to the Bailey's Crossroads branch of the Mount Vernon Bank and Trust Company for the purpose of cashing the Series G bonds then in Mrs. Farrell's possession. Mr. Farrell introduced himself to John E. Smith, vice president in charge of the branch, as a lawyer, and presented Martha as his wife and the minor child as Barbara Ann Heffernan. Mr. Smith was given a copy of the will; and the minor daughter signed Barbara Ann's name to the bonds payable to Barbara Ann Heffernan, and Martha signed her name to the bonds payable to Martha Heffernan Farrell, in the presence of the vice president of the bank. Mr. Smith then telephoned the doctor (whom he did not know) who had signed the death certificate of the late John V. Heffernan. He was advised the Farrells were honest well-to-do people. Mr. Smith did not know either of the Farrells or Barbara Ann Heffernan. They had no account at his branch, and he did not check with any of the other Mount Vernon Bank branches. He was not familiar with the United States Treasury regulations applicable to banks when cashing Series G bonds.

No documentary identification was required of the person representing herself to be Barbara Ann Heffernan, and no comparison was made of the alleged signature of Barbara Ann with a known sample of her true signature. No investigation was made re the probate or authenticity of the will.

Smith accepted the bonds as tendered, guaranteed the signature, and sent them to the Government for payment. Shortly thereafter, Mrs. Farrell and her minor daughter, still posing as Barbara Ann Heffernan, returned to the bank where she endorsed the Government check in the amount of $12,150.00 payable to her order, and caused her daughter to forge the name of Barbara Ann Heffernan on the Government check in the amount of $24,300.00 payable to the order of Barbara Ann Heffernan. Both checks were then deposited in a savings account in the name of Martha J. Farrell.

Thereafter, on April 1, 1958, Mrs. Farrell withdrew $36,000.00 from this savings account and purchased stock in her own name. She borrowed money from the bank in her own name and as trustee, using securities of the estate as collateral. She also sold securities of the estate and deposited the proceeds in her personal bank account, which were subsequently withdrawn and used for her personal benefit.

Some time during July of 1958, upon the recommendation of Smith, Andrew W. Clarke was employed by Mrs. Farrell as attorney for the estate of John V. Heffernan. Thereafter, during late July or early August, Mrs. Farrell told Mr. Smith she had committed a fraud and had gotten her daughter to sign the name of Barbara Ann Heffernan to her sister's Series G bonds. Mr. Smith advised Mr. Clarke, the bank's president, of this fact the next day. Subsequently Smith was told by Clarke to do nothing

about the matter as he had had it taken care of.

Clarke, some time in August, as attorney for the estate, prepared a document, to be signed by Barbara Ann Heffernan, purporting to release Mrs. Farrell from all claims in connection with her activities individually and as executrix and trustee under the will of her late father. This document recited a consideration of $30,000.00. Mrs. Farrell did not use this document. She prepared a similar release and had Barbara Ann sign it September 2, 1958. Clarke terminated his services as attorney for the estate during the middle of September, 1958. Subsequently this release was declared void by the Circuit Court of Fairfax County as being without consideration.

The balance in Martha Farrell's savings account in the Mount Vernon Bank and Trust Company, as of May 1, 1959, was $1,208.62. The balance in her checking account was $5,448.98. Clarke gave no instructions to the officers of the bank concerning these accounts prior to May 1, 1959, because he believed Martha had, by the release of September 2, 1958, settled her dispute with her sister Barbara Ann, and because he believed Smith had taken adequate precautions in guaranteeing the signature to protect the bank from loss. No criminal proceedings were brought by the bank against the Farrells until 1962.

On March 9, 1961, Barbara Ann Heffernan filed suit in the Circuit Court of Fairfax County, Virginia, against the Mount Vernon Bank and Trust Company, seeking recovery of her losses. She alleged negligence on the part of the officers of the bank in failing to ascertain the true identity of the forgers—in accepting her Series G bonds for collection from the forgers—and delivering the Government's $24,300.00 check to persons other than the true owner and in guaranteeing and certifying the signature of the forger as her true signature. She claimed damages in the amount of $24,300.00 with interest from March 10, 1958.

The bank promptly notified the defendant of the pendency of this suit. When the insurance company declined to defend, the bank employed counsel and filed its answer denying all acts of negligence.

Upon trial, the Circuit Court of Fairfax County awarded Barbara Ann Heffernan judgment against the Mount Vernon Bank and Trust Company in the amount of $24,300.00, plus interest of $405.90. The bank incurred attorney fees in the amount of $1,724.40 in defending the Heffernan suit.

The banker's blanket bond in the amount of $100,000.00, issued by The Aetna Casualty and Surety Company to the Mount Vernon Bank and Trust Company, covered the period October 1, 1951 to October 1, 1961.

Mr. Clarke, as president of the bank, first reported the matter to the bonding company by letter dated May 1, 1959, wherein he advised the company that he had learned on April 29, 1959, through the United States Secret Service that a fraud through forgery had been perpetrated on the Mount Vernon Bank and Trust Company and that the Treasury Department had been called upon to pay $24,000.00 to the payee of the Series G bonds. He enclosed a copy of all the details and facts pertaining to the matter. He further advised the company the Farrels had moved, and that he believed all of this money was invested in Diversified Investors Fund.

Upon these findings the Court concludes that even though the "loss" was covered, the bank cannot recover because it failed to give the insurance carrier notice thereof as required by the conditions and limitations of the bond.

The insurance carrier, in consideration of an agreed premium, undertook and agreed to indemnify and hold harmless the Mount Vernon Bank and Trust Company to an amount not exceeding $100,-000.00 from and against all losses sustained and discovered, as set forth in its Bond No. 53 F 3331.

The applicable provisions of the bond are as follows: Article (B) covers:

"Any loss of Property [on premises] through * * * larcency * * false pretenses, * * * whether effected with or without negligence on the part of any of the Employees. * * * "

The word "property":

"Wherever used in this bond * * * shall be deemed to mean money * * * and other valuable papers and documents, and all other instruments similar to or in the nature of the foregoing, in which the Insured has an interest or which are held by the Insured for any purpose or in any capacity and whether so held gratuitously or not and whether or not the Insured is liable therefor, and chattels which are not hereinbefore enumerated and for which the Insured is legally liable."

Article (D) covers:

"Any loss through FORGERY OR ALTERATION of, on or in any checks * * *."

The "loss" here sustained by the bank was the amount of money ($24,300.00) it paid to Martha Farrell in cashing the Government check payable to Barbara Ann Heffernan, plus the amount of attorney's fees and expenses ($1,724.40) it incurred in defending the suit filed by Barbara Ann Heffernan.

Whether the "loss" was directly attributable to larceny—false pretenses—forgery—or fraud through forgery, need not be determined herein, for the bond undertook to indemnify the bank for any such loss of property for which it was legally liable, with or without negligence on the part of its employees. That the bank was legally liable is beyond question. The Circuit Court of Fairfax County has so held, and that decision is now final.

The insurance carrier's contention that the bank's "loss" resulted solely from its negligence through paying or redeeming or guaranteeing or witnessing the signatures upon the Series G bonds [1] is without merit. The "loss" here sustained resulted from the fraud through forgery perpetrated by the Farrells. It is clearly covered by the broad terms of the blanket bond, and the Court so finds.

Recovery under the bond, however, is subject to the following condition and limitations, as expressly set forth therein:

"Section 3. At the earliest practicable moment after discovery of any loss hereunder the Insured shall give the Underwriter written notice thereof and shall also within six months after such discovery furnish to the Underwriter affirmative proof of loss with full particulars. * * "

■ Compliance with this section of the bond is a condition precedent to recovery. Adelman v. St. Louis Fire and Marine Insurance Company, 110 U.S.App. D.C. 392, 293 F.2d 869; Muncie Banking Company v. American Surety Company of New York, 200 F.2d 115 (7th Cir.); Fidelity & Casualty Company of New York v. Hoyle, 64 F.2d 413 (4th Cir.); Wachovia Bank and Trust Company v. Independence Indemnity Company, 37 F. 2d 550 (4th Cir.).

■ The bank, through its president and vice president, learned of the fraud committed by the Farrells during the early part of August, 1958. Shortly thereafter, Mr. Clarke, as attorney for the estate, prepared a release to be executed by Barbara Ann Heffernan, releasing Martha Farrell from all claims, individually and as executrix and trustee of her father's estate.

. Subsequently, Mr. Clarke told Mr. Smith, (the bank's vice president) to do nothing about the matter as he had had it taken care of.

Mr. Clarke learned on April 29, 1959, from the United States Secret Service that a fraud through forgery had been perpetrated on the bank and that the United States Treasury had been called

1. The carrier says losses sustained in re the cashing of Series G bonds are not covered by the blanket bond.

upon to pay the $24,300.00 to the payee (Barbara Ann Heffernan) of the Series G bonds. He advised the insurance carrier accordingly on May 1, 1959.

It was stipulated herein, and Mr. Clarke testified, that he did not notify the insurance carrier of the possible loss under the bond (prior to May 1, 1959) because he thought Martha Farrell and her sister had, by the release, settled their dispute, and because he thought the vice president of the bank had taken adequate precautions in guaranteeing the signatures to protect the bank.

The "notice" here required under the condition and limitation of the bond is "At the earliest practicable moment after discovery of any loss hereunder." It is clear from the record in this case that such notice was not timely given. The word "loss" as used in this condition means the date the fraud was discovered by the bank—not the date the bank was called upon to make the loss good.

It appears to be well settled, upon the authority of Ocean Accident & Guarantee Corporation v. Old National Bank, 4 F.2d 753 (6th Cir.); Home Insurance Company v. Peoria & P. U. Railway Company, 178 Ill. 64, 52 N.E. 862, and other cases as reported in National City Bank v. National Security Company, 58 F.2d 7 (6th Cir.), that the word "loss" refers to a condition in which the insured would be subjected to a claim or demand "out of which a legal liability might arise," and not to an adjudicated liability. See also Muncie Banking Company v. American Surety Company of New York, 7 Cir., 200 F.2d 115.

The Mount Vernon Bank and Trust Company was subjected to such a claim at any time after it discovered that Martha Farrell caused her daughter to forge the name of Barbara Ann Heffernan to the $24,300.00 Government check.

The bank first discovered this "fraud through forgery" during late July or early August, 1958. It should have noti-fied the insurance carrier of the probable loss resulting therefrom at the earliest practicable date thereafter.

Having failed to so do [2] the bank cannot recover the "loss" from the insurance carrier.

Counsel for the defendant should prepare an appropriate dismissal order in accordance with this memorandum opinion, submit it to counsel for the plaintiff for approval as to form, and it will be accordingly entered.

2. Notice of loss was given the insurance carrier May 1, 1959—more than nine months after the date of discovery of loss.