The **ORE & CHEMICAL CORPORA-TION**, Plaintiff-Appellant.

v.

**EAGLE STAR INSURANCE COMPANY, LIMITED**, Defendant-Appellee.

No. 27, Docket 72-2103.

United States Court of Appeals, Second Circuit.

Argued Oct. 12, 1973.

Decided Dec. 21, 1973.

Robert P. Anderson, Circuit Judge, filed a concurring opinion.

William R. Norfolk, New York City (Sullivan & Cromwell, New York City of counsel), for plaintiff-appellant.

Charles T. Weintraub, New York City (Weintraub & Fass, New York City, of counsel), for defendant-appellee.

Before FRIENDLY, ANDERSON and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

At issue on this appeal is whether the loss of some 1,600 ounces of placer gold, stolen in an armed robbery carried out in a Sheridan, Wyoming, motel under conditions reminiscent of the days of Wild Bill Hickok, is covered under the "in transit" provisions of an All Risks Inland Marine Floater policy. Under the terms of the policy the Eagle Star Insurance Company, Limited ("Eagle Star") insured The Ore & Chemical Corporation ("Ore & Chemical") against all risks of loss on incoming and outgoing shipments of goods (including ores) "while in due course of transit until delivered." [1]

In an action tried before Judge John M. Cannella, sitting without a jury, Ore & Chemical sought to recover under the policy for a theft of the placer gold,

---

1. The provision detailing the coverage of the policy reads in pertinent part: "This insurance is to cover from the time of leaving original point of shipment and thereafter continuously while in due course of transit until delivered into factory, store, premises, or warehouse at destination. . . ."

which occurred after the gold had been transported from Spearfish, South Dakota, to Sheridan, Wyoming, where it was being held overnight for inspection by and expected delivery to a purchaser. If no sale should be consummated, the gold was to be returned immediately to Spearfish. Judge Cannella concluded that the gold was no longer in due course of transit at the time of the theft because the overnight custody of the gold in the hands of Ore & Chemical's agents amounted to a delivery. We conclude that the district court construed the due-course-of-transit clause too narrowly. Accordingly we reverse.

The facts regarding Ore & Chemical's loss of the gold are undisputed. The sorry tale began with its direction to its agent, the Keystone Company, to seek a purchaser for a lot of placer gold amounting to 1,609.979 ounces, which it had purchased for $68,787.06. Keystone was authorized to negotiate with prospective purchasers and to make commitments for sale upon approval by Ore & Chemical. After an uneventful month of discussions with prospective purchasers, there came a call from one "Jack Stodder," who expressed an interest in the gold. In the course of negotiations by telephone Stodder agreed to purchase the gold for $112,106 on the understanding that he would have the right personally to inspect and assay the gold and then negotiate the precise purchase price. At his insistence the inspection, sale and delivery were to take place in Sheridan, Wyoming, presumably a city neutral for and centrally located between the seller and the purchaser. Keystone informed Stodder that on March 24 its President T. J. Oltmans and Vice President A. C. Zapf would bring the gold to Sheridan, where inspection and final negotiations on the price would take place.

Initially, all went as planned. Keystone's officers, Oltmans and Zapf, transported the gold from its bank in Spearfish, South Dakota, by chartered plane to Sheridan, where the gold was taken to the motel room for the inspection. Stodder met with Oltmans and Zapf twice that evening. The parties were unable to agree upon a final price but arranged to meet again at eight o'clock the next morning for continuation of negotiations. However, Oltmans, apparently doubting that the sale would be consummated as planned, had decided not to keep this final appointment and instructed Zapf and their pilot to prepare to transport them with the gold back to Spearfish the next morning before the scheduled meeting. Shortly after seven o'clock on the following morning Stodder returned with two companions and at gunpoint relieved Oltmans and Zapf of the gold.

The district court concluded that this loss would have been covered by the insurance policy but for the "interruption" at the motel. Placer gold was an insured commodity under the terms of the parties' contract (Par. 3). Loss due to armed robbery was a risk covered by it (Par. 12). The policy also permitted Ore & Chemical to act as its own carrier and to use the modes of transportation employed. However, the interruption at the motel was determined by the court not to have been "in due course of transit" but to have constituted a delivery for the plaintiff's purposes, i. e., to set up a place for doing business with Stodder, unconnected with the transportation of the gold. Since defendant does not seriously question here any of the district court's findings favorable to plaintiff with regard to the scope of the policy, the sole issue presented to us for consideration is whether the district court correctly interpreted the due-course-of-transit language under the prevailing law. We conclude it did not.

 At the outset we observe that the courts of New York, the law of which governs, have not been niggardly in their reading of the due-course-of-transit clause. Their guiding rule of construction is one founded upon the "objectively reasonable expectations" of businessmen relying upon this type of policy.

"The true test thus appears to be not whether movement was interrupt-

ed overnight, or over a week end, but whether the goods, even though temporarily at rest, were still on their way, with any stoppage merely incidental to the main purpose of delivery. . . . If darkness had overtaken the driver on the road, and he stopped at a motel for a night's sleep before continuing on his journey, it could not be said that transit had ceased. . . .

"In the final analysis, the outcome of a case such as this should be determined not by precise semantic shadings of terms of art, but by commonsense appraisal of the overall situation." Ben Pulitzer Creations, Inc. v. Phoenix Ins. Co., 47 Misc.2d 801, 804, 263 N.Y.S.2d 373, 376 (Civ.Ct.N.Y. 1965), affd. without opin., 52 Misc.2d 934, 276 N.Y.S.2d 1009 (App.Term, 1st Dept. 1966).

To this observation must be added the rubric of insurance law that any ambiguity in the construction of a policy will be resolved against the insurer. Bronx Savings Bank v. Weigandt, 1 N.Y.2d 545, 154 N.Y.S.2d 878, 136 N.E.2d 848 (1956). See also Restatement (Second) of Contracts § 232.

■ Applying these principles here, there can be no serious doubt but that the transportation of the placer gold would as a general matter fall within the bounds of "due-course-of-transit" as that term has been construed by the New York courts even though there was not an unequivocal commitment from Stodder to purchase the gold. See Franklin v. Washington Gen. Ins. Corp., 62 Misc.2d 965, 310 N.Y.S.2d 648 (Sup. Ct.1970), affd. without opin., 36 A.D.2d 688, 319 N.Y.S.2d 383 (1st Dept. 1971) (transport for purpose of exhibition covered by due-course-of-transit clause).[2] The gold was transported to Sheridan with the intention of selling and delivering it to Stodder at such "factory, store, or premises" as he should designate or, if no sale and delivery could be made after the inspection by Stodder, of returning it to the premises designated by Ore & Chemical at Spearfish.

■ The district court, although noting that Stodder was not a consignee, saw the plaintiff's case founder not so much for that reason, which would be insufficient, as because of the stoppage at the motel. However, an interruption in the course of transport does not in itself remove the goods from the coverage of a due-course-of-transit clause. That result will depend upon the extent and the purpose of the interruption. Franklin v. Washington Gen. Ins. Corp., 62 Misc.2d 965, 310 N.Y.S.2d 648 (Sup.Ct. 1970), affd. without opin., 36 A.D.2d 688, 319 N.Y.S.2d 383 (1st Dept. 1971).

"The true test is whether the goods, even though temporarily at rest, were still on their way, with the stoppage being merely incidental to the main purpose of delivery." 62 Misc.2d at 966–967, 310 N.Y.S.2d at 650.

An overnight stop, for instance, is comfortably within the limits established by case law for an insured interruption. See Ben Pulitzer Creations, Inc. v. Phoenix Ins. Co., *supra*. The familiar case is one where the stop is occasioned by darkness or the carrier's need for rest. But we see no reason for limiting a permissible stoppage to such considerations. See Ben Pulitzer Creations, Inc. v. Phoenix Ins. Co., *supra*. Although there is room for difference in viewpoint on the matter, we do not agree with the district court's conclusion that this interruption was "wholly independent of and in no way related to the transportation of the placer gold." The purpose of the shipment was to make delivery of the gold to such "premises" as might be designated by the single prospective purchaser, presumably somewhere in Sheridan, if final agreement should be

---

2. That the parties intended coverage for unsold goods in transit is evidenced by an endorsement which specifies the measure of recovery for such goods (Joint App., C17) and by the specific exclusion of "samples" in the custody of salesmen (Joint App., C19) which would have been unnecessary if all unsold goods were excluded.

reached after inspection and assay, or to return it to Ore & Chemical's premises in Spearfish on the following day if no agreement could be reached. Thus one continuous shipment, with alternate destinations, was contemplated.

The overnight stop at the Sheridan motel was designed to facilitate the inspection of the gold by the prospective purchaser. Since inspection is a natural, indeed a necessary, part of many sales and delivery transactions, this stoppage was clearly related to the purpose of the carriage. Retention overnight in the vehicle used for carriage was not essential. Such a wooden restriction might in some cases only serve to increase the risk of loss. The test is a more flexible one, based on the reasonable expectations of the average businessman. Indeed, a theft of goods left for inspection by a purported purchaser has been held nonetheless to be a loss "in transit". See Underwood v. Globe Indem. Co., 245 N.Y. 111, 156 N.E. 632 (1927); Ocean Acc. & Guar. Corp. v. Old Nat'l Bank, 4 F.2d 753 (6th Cir. 1925).

That Keystone had determined to break off negotiations prior to the theft does not affect the result. The insurance policy clearly envisioned that return shipments "regardless of cause of return" would be covered. Whether the stoppage be viewed as one in a continuing shipment with alternative destinations or as one in a bifurcated journey with an outgoing and incoming segment, it remains a stoppage incidental to the carriage and hence within the coverage of the due-course-of-transit clause.[3]

There is no reason to fear that our construction of the policy's in-transit clause would permit a wholesale transfer of sales activities to the field, thus enabling Ore & Chemical or any other dealer to move its merchandise to motel rooms across the country and still enjoy the coverage of a due-course-of-transit policy. That the clause must be flexibly interpreted does not license every stoppage as a mere interruption incident to carriage. As an interruption or stoppage is protracted, its relation to the transit falls off sharply and independent, unrelated purposes may develop and predominate. If the purpose of a junket for instance, were to induce anyone with a general interest to inspect a product, the role of the transit would become more attenuated. If, in addition, this resulted in a four or five day sojourn, with interested parties queuing up outside the motel room, the point of non-coverage might well be reached. Here, however, we have an overnight stay in preparation for either the sale and delivery to an identified purchaser as the result of extended negotiations or the immediate return of the goods. We cannot say that this stop was sufficient to remove the gold from its due course of transit.

While Judge Anderson, in a separate concurring opinion, disagrees with our interpretation of the due-course-of-transit clause, we do not disagree with his reading of Underwood v. Globe Indemnity Co., 245 N.Y. 111, 156 N.E. 632 (Ct. of App. 1927), as pointing to an alternative construction that calls for the same result in the present case because

---

3. The court in Underwood v. Globe Indem. Co. suggests that in the case of a purchaser-thief there can be no delivery and the transit is never completed. There the thief had purchased bonds from the plaintiff with an ostensibly certified but unsigned check. When the insurance company balked at covering the loss on the ground that the theft had occurred after the bonds had been delivered and were no longer in transit, the court observed:

"The bonds were in transit within the meaning of this policy when they were taken out for delivery, and until delivery, in the legal sense of that word, to a customer. The bonds were in Del Re's [the plaintiff's employee] possession when they were obtained from him by a trick and false device; title never passed to Dunn [the thief]; they were procured from Del Re by common-law larceny. Therefore, there had never been a delivery to end the transit. The bonds were still in transit in the process of being taken somewhere for delivery, or to be returned to the office when stolen from Del Re." 245 N.Y. at 115, 156 N.E. at 634.

Keystone was induced by fraud on Stodder's part to transport the gold to the Sheridan Motel and thus unwittingly provided him with the opportunity to commit the robbery.

The judgment of the district court is reversed.

**ROBERT P. ANDERSON**, Circuit Judge (concurring):

I concur in the result but reach that determination by a different route from that of the majority, which I find difficult to accept.

Had the transportation of the gold from its safe depository in the bank at Spearfish to the motel in Sheridan been made at the request of a trustworthy and reliable customer in the course of a bona fide transaction, for the purpose of facilitating the inspection, weighing and assaying of the gold by the customer with a view to his purchasing it, I do not think that a theft of the gold, by a third person, while it was at the motel would have afforded a proper ground for the recovery by the insured under the terms of the policy in question.

The majority opinion treats the policy as if it provided broad "in transit" coverage, while its express terms refute such intention by providing coverage only "while in due course of transit *until delivered into factory, store, premises, or warehouse at destination* . . ." (emphasis added). It is not for this court to enlarge the parties' own definition of the cut-off point for coverage as the time the insured goods were "delivered . . . into . . . the premises . . . at destination."

New York law applies; and the majority cites no decision dealing with a policy containing such a qualification of "in transit", but instead relies on cases with policies of far greater scope. See, e. g., Ben Pulitzer Creations, Inc. v. Phoenix Ins. Co., 47 Misc.2d 801, 263 N.Y.S.2d 373 (Civ.Ct.N.Y.1965) (insured "while in due course of transit between the premises of the Insured and the premises of his contractors . . .

and while on the premises of contractors"). The majority also cites the latest New York decision on the subject, Franklin v. Washington General Insurance Corp., 62 Misc.2d 965, 310 N.Y.S.2d 648 (Sup.Ct.1970), aff'd without opinion, 36 A.D.2d 688, 319 N.Y.S.2d 383 (1st Dept. 1971), and describe it as a case which held, "transport for purpose of exhibition covered by due-course-of-transit clause." This unfortunately implies that a theft of the rare documents was effected after arrival at the place of the exhibit, which was in California, and while they were on exhibition. Actually the documents were stolen in New York from the insured's automobile where he had temporarily left them preparatory to driving to Kennedy Airport to board a plane with the documents to take them to California.

The majority also quote this case as authority for the perfectly sound proposition that "a temporary interruption for a purpose related to the carriage itself does not remove the property from transportation." It then asserts that the inspection, weighing and assaying of the gold after its arrival at the motel and the sale negotiations were "a purpose related to the carriage itself." I cannot agree that there is anything in New York law or the facts of the cases which, assuming a normal, legitimate business transaction, supports any such innovation. See, Federman Co., Inc. v. American Insurance Co., 267 N.Y. 380, 196 N.E. 297 (Crt. of App. 1935), motion for reargument denied, 268 N.Y. 609, 198 N.E. 428 (1935), which concerned a much broader policy than that under consideration. If the insured, Keystone, for such legitimate business transactions had sought "off premises" coverage with protection against theft by third persons regardless of whether its goods were in transit or not, it could have obtained a policy with that provision in it.

The New York Court of Appeals, however, has recognized an exception to the general rule for "in transit" cases that "transit" ceases when the goods have

been delivered to the customer-consignee or his agent or have been delivered, as claimed by the insurer in the present case, "into premises at destination," and that exception is, where such delivery or diversion from transit is brought about by falsification, misrepresentation or like factor in the course of the perpetration of a theft, robbery or other criminal scheme. See Underwood v. Globe Indemnity Co., 245 N.Y. 111, 156 N.E. 632 (Crt. of App. 1927).

The present case does not relate to an ordinary, legitimate, business transaction where, for the purpose of construing particular provisions of the policy, consideration may be given to the "objectively reasonable expectations of business men" in the context of the transportation of goods looking toward a lawful sale and delivery to a customer and, failing that, a return of the goods to their regular repository. From the time the con-man and thief, Jack Stodder, induced Keystone to take the gold out of the bank and transport it to the Sheridan Motel, to the time Oltmans and Zapf, at the point of Stodder's pistol, turned the gold over to him, the case was one of theft and robbery. Although the insured, in transporting the gold to Sheridan thought it was carrying out a legitimate plan of its own, it actually was carrying out the felonious plan of the thief. Keystone transported the gold to Sheridan at Stodder's bidding. They were dancing to his tune. The transfer was part and parcel of his larcenous scheme, and, once the gold was in the motel, in the hands of the gullible and defenseless officers of Keystone, the theft was more than half accomplished. The stop-over at the motel was directly related to the carriage, both of which were designed to facilitate the theft.

It is apparent that Stodder's project started out as a plan for larceny by trick. When Keystone's officers did not turn the gold over during the evening's negotiations and showed signs of disaffection toward the proposals, Stodder decided to accomplish his purpose by armed robbery.

As the temporary retention of the gold at the motel was an essential step in the theft, there was no lawful "delivery . . . into premises . . . at destination, and" therefore no cut-off of the coverage.

As Judge Crane said in the *Underwood* case (*supra*), in which bonds were stolen from an agent by false representations, " 'In transit' means, in this case, while going to make a delivery to a customer. . . . ; [t]he bonds were in [the agent's] possession when they were obtained from him by a trick and false device . . ., [t]herefore, there had never been a delivery to end the transit." Underwood v. Globe Indemnity Co., *supra*, 245 N.Y. at 116, 156 N.E. at 634.

Likewise, in the present case there was never any lawful delivery to premises at a legitimate business destination, even though the Keystone officers thought it was. Instead, the temporary stop-over at the motel was designed by the thief to put the gold in a position where it could be readily taken.

In Hanson v. National Surety Co. (Crt. of App. 1931), 257 N.Y. 216 at page 220, 177 N.E. 425, at page 426, the court said:

"Even at common law 'if a party fraudulently obtains possession of goods from the owner, with intent at the time to convert them to his own use, and the owner does not part with title, the offense is larceny.' . . . The original wrongful intent may be inferred from subsequent conduct. . . . It cannot be said that the larceny occurred after the messenger had ended the transit risk by delivery at destination, when that delivery was itself the consummation of a scheme to obtain possession with larcenous intent."

For a discussion of the New York law see Sutro Bros. & Co. v. Indemnity Insurance Co. of North America, 386 F.2d 798, 801–803 (2 Cir. 1967).

The coverage of Keystone's policy was not terminated and the judgment below must be reversed.