Samuel C. Coleman, J.
Three plaintiffs join in an action against a stock brokerage firm to rescind the purchase of shares of an insurance company purchased through the defendants and to recover the amount of the purchase price — nearly $60,000. The shares were of a Colorado life insurance company ‘' not authorized to do business ” in New York, and the defendants had no license from the Superintendent of Insurance to sell the shares (Insurance Law, § 51, subd. 1). The plaintiffs then, prima facie at least, have a right of action in rescission, unless subdivision 6 of the same section validates the transactions. So much has already been decided (Atkin v. Hill, Darlington & Grimm, 15 A D 2d 362, affd. 12 N Y 2d 940 “ rescission is appropriate relief for a violation of section 51 of the type alleged by plaintiffs ” [p. 367]).
Subdivision 6 of section 51 reads: ‘ ‘ This section shall not apply to the selling or proposing to sell securities after one *865 year from the first date upon which the security was offered to the public in this state ’ ’. Upon the trial, the defendants argued, and they repeat the argument, that it was the plaintiffs’ obligation to prove the facts against exemption. I thought otherwise and I restate that view, implicit, I believe, in the words of the Appellate Division. The sales on their face were unlawful, and it was for the defendants to show additional facts that would exempt them from liability; to show that the statute does not apply to the transaction in question.
The defendants did attempt to do so, and I think their attempt successful. They refer to the gloss put upon the statute by the Appellate Division, which serves as a guide for its application to the facts here.
“ The statute, in the aspect under discussion, should be read, it seems to us, as a dealer in the position of defendants would reasonably read it. Consulting subdivision 1, he would find his proposed sale to the public forbidden except as provided in subdivision 6. Consulting that subdivision, he would find his proposal permissible if a year had elapsed since the first date on which the .security was offered to the public in New York. Confronting him would be the ascertainment of that date, and if he found that the security had been traded in the over-the-counter market for at least a year, he would conclude —sensibly, we should think — that the date must have been a year or more in the past. Nor would it normally occur to him to inquire when the specific securities he proposed to .sell were first offered in New York. * * * We do not believe the Legislature intended to penalize him for following this natural and rational course ” (p. 368).
The first sales to the plaintiffs were in January, 1959, and we are to inquire whether “ the security had been traded in the over-the-counter market for at least a year ’ ’ before that date; or perhaps only whether the defendants would reasonably be justified in believing that was the fact, however unlawful the earlier sales by others may have been. (From Jan., 1959 to Aug., 1960 the defendants sold a total of 5,400 shares to the plaintiffs.) We are not to determine whether there was a “ public offering ” in the one-year period in the sense in which newly issued securities are formally presented to the public; nor are we to ascertain whether there were actual sales in New York within that period.
The plaintiffs contend that the defendants must show both, a public offering and actual sales. But, as the Appellate Division points out, neither circumstance is a requirement of exemption. “ [A]fter the security has been on the New York *866 market for a year, he [a dealer in defendants’ position] may trade as freely as any private investor ” (p. 370); and u actual sales ” are resorted to as fixing the date — contemporaneous or earlier — of an offer to sell. -There is no suggestion that there is to he a ‘ ‘ public offering ’ ’ and actual sales. It is enough that in the preceding year there were offerings to prospective purchasers in New York of shares of the company in question in •sufficient quantity to enable one to say the security ‘ ‘ has been on the New York market for a year ”.
There were some actual sales, few in number, but they indicate trading: a purchase of 50 shares in September, 1957 by a resident of Brooklyn, after he had received descriptive matter soliciting the transaction (June, 1957); a purchase of 5 shares by a resident of Rochester in 1957, on the basis of a circular soliciting the purchase; a purchase of 100 shares in October, 1957 by a resident of Buffalo, again after receiving “ soliciting literature ’ ’. There were other purchases in the early part of 1958, based upon offers made in 1957. And there were other transactions early in 1958 of purchases and sales through brokers in this State.
The first sales I mentioned were effected through brokers and dealers in Colorado, and the plaintiffs argue that those sales cannot be considered; that the entire transaction must take place in New York. But I see no such requirement in the statute; within its language ‘ ‘ the security was offered to the public in this state ” — and whether by mail from outside the State or in any other manner is of no consequence. The Appellate Division does not suggest this requirement. Those sales may have been illeg’al, but the defendants were not involved in them.
These sales, I believe, should lead to the conclusion that the defendants were free to deal in the securities with the plaintiffs when they did. But there are additional facts which make the conclusion even firmer from a practical -standpoint. Bearing in mind that the statute does not require proof of sales as a condition of exemption but only proof of offerings, I turn to the testimony of such offerings, based upon what are referred to in “ over the market ” transactions as “ pink sheets ”. Here the defendants are on strong ground.
For the “ pink sheets ” are what -are regularly relied on by professional traders — -dealers, brokers and others — to ascertain what the “ market ” is in unlisted securities. They are not the recording of actual sales, -such as we find reported day-by-day by the New York Stock Exchange and repeated in some daily newspapers of large circulation. But within trading *867 circles, they serve the same purpose. Published daily by the National Quotation Bureau, they are used in buying and selling circles in “ over the counter ” securities. They list such securities alphabetically and state the names of dealers, their telephone numbers, and the prices at which they are prepared to purchase or to sell.
“ The ‘ sheets ’ published by the National Quotation Bureau, Inc. (the 1 Bureau ’) are the primary medium for the dissemination of wholesale or 1 inside ’ quotations among professionals. They are of crucial importance to the over-the-counter markets. * * * Professionals use the 1 sheets ’ to find and communicate buying or selling interests in securities and to judge activity. The wholesale prices supplied by dealers for the sheets are used by the NASD [National Association of Securities Dealers, Inc.] for determining which securities to quote at the retail level and computing retail quotations which are published in the newspapers ” (p. 595).
The sheets of the Bureau are ostensibly available only to broker-dealers to inform them of interests in buying or selling securities. The bids and offers that appear may not be a completely accurate indication of the actual market at the time of publication since there is inevitably a delay between a broker-dealer’s submission of a quotation and its publication. However, quotations are supposed to be ‘ firm ’ as of the time of submission: when a broker-dealer submits a quotation, he represents that he is, at that time, willing to trade at the prices quoted. If the quotation represents only a basis for negotiation, there is supposed to be an indication to that effect ’ ’ (p. 596).
* * *
“ The Bureau exercises final control over who may enter quotations, and thus, in large degree, over who may do wholesale business in the over-the-counter markets; what minimum capital may be needed to do such business; what securities may be listed; and what kind of listings may be made. The Bureau appears to have operated with a conscientious regard for the responsibility which its function and dominant position entail. It investigates the past business history of those who wish to insert quotations and requires that applicants have a certain minimum capital commitment to the business. It reserves the right to cancel a subscription for inserting nongenuine listings or for engaging in ‘ any unethical business practice ’ and it is understood that the insertion of suspect listings has played a tacit part in some cancellations. Finally, the Bureau has cooperated with the Commission by turning over evidence of *868 misuse of its facilities. In short, while hampered by insufficient authority and procedures, the Bureau has sought in various ways to insure the integrity and reliability of the sheets ” (p. 663).
(Report of Special Study of Securities Markets of the Securities & Exch. Comm. [88th Cong., 1st Sess.], House Doc. No. 95, Part 2 [1963], pp. 595, 596, 663.)
It is plain enough then, that just as one would turn to the listings of transactions on a recognized exchange to ascertain the price of actual sales, so one would follow the ‘' natural and rational course ” of consulting the “ sheets ” to determine what offerings there were — purchase or sale. And the uncontradieted testimony was that that was the very thing done by brokers in dealing with over-the-market securities. Now it would be chimerical to assert that in every instance it was done to determine whether the one-year period of purification had been fulfilled; it was done rather to find out what was being offered for purchase or for sale, but the “ sheets ” also served the purpose of fixing the time of these offerings.
The “ sheets ” in evidence show that in October, November and December, 1957 there appeared four separate quotations for the shares of the company in question, by three separate securities firms — all in this city — the offers in each instance originating in New York. In addition, there were three in February and March, 1958 — by three other firms in this city. The number of quotations in 1957 — four, is not large, but it is sufficient to indicate activity, and to show “ offerings ”. Indeed, the witnesses for the defendants, including one who was “ cautious ” in his dealings in life insurance shares testified that four instances of published quotations by three different dealers in New York within the proscribed one-year period would be sufficient evidence that the security involved had been offered to the public. In addition, the National Stock Summary, a standard reference work in the securities market shows quotations of the shares in the insurance company in New York in 1957 and 1958.
I have said that brokers do not necessarily refer to the “sheets” to learn whether a proposed sale is lawful. The defendants here do not assert they consulted the ‘ ‘ sheets ’ ’ for any purpose. Indeed, they were indifferent to the matter, to the extent of ignoring intimations of illegality in their transactions with the plaintiffs. But the statute does not require proof by the defendants of what they did at the time of the transactions; only proof of what a later objective view shows was the situation at the time, perhaps only of what a broker *869 reasonably believed or could have believed what that situation was. Here I am satisfied that for more than a year before the plaintiffs had their first transaction with the defendants, the shares of the company had been “ offered to the public in this state ’ I am equally satisfied that if the defendants had reasonably looked into the situation, they would have been justified in believing that they could lawfully deal in the securities.
The plaintiffs base their argument on the hypothesis that the defendants really are not in the position “ assumed ”— in their words, by the Appellate Division. They assert that the defendants were dealing in “ contraband ” goods, were “ importing ” them into New York in the course of distribution of the shares of the insurance company, within the meaning of the term 1 ‘ distribution ’ ’ as used in transactions within the competence of the Securities and Exchange Commission. But, not only were the securities not contraband (earlier transactions by other dealers may have been “contraband”), the defendants were not concerned in the “ distribution ” of shares of stock. They had no shares, no inventory of their own, no arrangements for “ distribution ” and they dealt with each order of the plaintiffs ad hoc, obtaining shares where they could, from dealers and other brokers and not from the insurance company. That they went outside the State to obtain the shares is irrelevant; for it would not " normally occur to [them] to inquire when the specific securities [they] proposed to sell were first offered in New York ” (15 A D 2d 362, 368). The fact that the transaction with the plaintiffs bulked large is equally irrelevant. In making their purchases to fill orders for the plaintiffs the defendants acted at times as principles, at times as brokers. As to this the plaintiffs say in their brief: ‘ ‘ that as a matter of law the prohibition contained in section 51 extends to all transactions, without distinction between transactions by agents, brokers or principals, whether solicited or unsolicited ”. I agree that that is so; and the exemption extends equally to all transactions. The defendants come within the exemption and the plaintiffs cannot rescind. Their complaint is dismissed.
The defendants have a third-party complaint against their insurer upon a policy of insurance.. There was testimony on the nature of the insurer’s liability. But as there is no liability of the defendants to the plaintiffs, the question is academic, except as it bears on the matter of the costs of litigation.
The defendants assert that the insurer must pay the costs of the defense of this action, including legal fees. (“ Coverage under this bond shall include court costs and reasonable attorneys’ fees incurred or paid by the assured in the defense of *870 any claim, suit or legal proceeding made or brought against the assured which, if paid or established would be a loss recoverable hereunder, such coverage to be in addition to the amount of this bond; provided, however, that the company may, if it so elects, select attorneys for the defense of such claim, suit or legal proceeding.”) I do not believe they are correct. The position of the insurer is that it is not obligated to defend; it may do so and it then pays its own costs, irrespective of the outcome of the suit. But if the action is defended by the insured, the obligation to pay attorneys’ fees or to reimburse for their payment does not automatically, irrespective of whether the insured was successful in its defense, or was defeated in it, and upon what grounds, fall upon the insurer. We must look to the policy. And here two views are possible. The insurer argues that until the liability of the assured is established” in fact, we need not consider whether the loss sustained by it “ would be a loss recoverable hereunder ”. Where there is no liability to a third person, it says, there can be, there is, no loss within the “ coverage under this bond ” (cf. Cornell v. Travelers’ Ins. Co., 175 N. Y. 239). We need go no farther, the insurer says, particularly as the burden to defend in the first instance is upon the insured. This is a permissible view. The other is that suggested by the insured. The policy does not require that the liability of the insured to the plaintiffs be first determined in the plaintiffs’ favor. “ The phrase, ‘ which, if paid or established, would be a loss recoverable hereunder ’ ”, means, it says, “ only that [the insurer] does not undertake to insure against litigation expenses of proceedings not within the coverage of the policy ”. That is to say, the insured argues that if the claim made were established against it, it would have to show, for complete indemnification, including costs of litigation, that the claim was for a risk insured against. And, if it were not established, similarly, that the claim, if it had been would have made it the obligation of the insurer to pay, here only costs of litigation.
Yet, if we accept the insured’s argument it cannot prevail. If the plaintiffs had prevailed over the brokerage firm, and the latter were seeking full indemnification, it would have to show, in this action, or in an independent one, that the loss to it was sustained ‘ ‘ by reason of any dishonest, fraudulent, or criminal act of any of the Assured’s officers, employees or guest students ”. The plaintiffs’ transactions were all carried on with an employee of the brokerage firm in its Rochester office. There was testimony and argument which did not conern the plaintiffs dealing with the question whether the employee’s conduct was “ dishonest, fraudulent or criminal ” within the meaning of the *871 policy and whether his conduct was enough to throw liability upon the insurer. Let us assume up to this point that the insurer would be liable. But the ploicy did not cover “ any loss resulting from any wrongful act or acts of any director for the Assured other than an Employee of the Assured, or of any partner of the Assured.” Here all the orders placed by the plaintiffs with the employee in Rochester were sent to the New York office, where they needed the authorization of a partner of the firm before final approval, whether or not the particular order had already been executed. They were all approved by a partner (all but one, apparently by oversight); one partner approved 12 separate orders for the purchase of a total of 2,000 shares, out of entire purchases of 5,400 shares. Now the plaintiffs, if they otherwise had a cause of action against the brokerage firm, were in no way interested in whether the Rochester orders required approval in New York. But the insurer is, and it is absolved from liability to its insured by the very acts of the partners of the insured firm. The loss, if there had been any, would have resulted from the ‘ ‘ wrongful act or acts ” of the partners in authorizing the transactions. The partners may or may not have thought their acts were illegal, or ‘ ‘ criminal ’ ’, but by hypothesis, they would have been wrongful and they cannot look to the insurer for reimbursement for losses arising from their own wrongful conduct. They undertook certain transactions for profit for the firm, for themselves, they sold shares and their own acts were in violation of law, wrongful, and so not a risk insured against. If the defendants would have been liable to the plaintiffs it would have been for their act of selling shares unlawfully, and this apart from whet her their act was also “ criminal ”, irrespective of whether it wi 3 “ criminal ” in the employee and whether the partners in the firm could be held “ criminally ” for the act of their t nployee. This is not a case of ignorance upon the part of partners of what an employee was doing or of partners’ justifiably relying upon an employee’s honesty and integrity. The partners knew what the employee was doing; they approved it, it was wrongful, whether or not the employee knew it was wrongful (Kean v. Maryland Cas. Co., 221 App. Div. 184, 191, affd. 248 N. Y. 534). A recovery then by the plaintiffs would not have created a loss “ within the coverage of the policy ” and by the insured’s test of recovery for costs of litigation it cannot recover such costs.
It is unnecessary to consider the insured’s argument with respect to another exclusion clause in the policy. Here, too, the partners’ knowledge and conduct stand in the way of a *872 recovery. It is unnecessary to consider the many cases cited by the litigants; the language of each policy is to be read. A policy may provide for reimbursement of litigation costs whatever the outcome of the principal action, and however groundless or meritorious the claim against the insured either in pleading or proof. This is not such a policy. Cases dealing with the obligation of the insurer to defend in the first instance with or without reference to the language of the complaint against the insured, are irrelevant. The third-party complaint is dismissed.